213 N.J. Super. 419 (1986)
517 A.2d 509
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
JOSE SERRANO, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Submitted October 7, 1986.
Decided November 7, 1986.
*420 Before Judges PRESSLER, GAULKIN and BAIME.
Alfred A. Slocum, Public Defender, attorney for appellant (Charles N. Martel, Designated Counsel, on the brief).
W. Cary Edwards, Attorney General, attorney for respondent (Gerard Boruch, Deputy Attorney General, on the brief).
PER CURIAM.
Defendant was found guilty by a jury of third-degree terroristic threats (First Count, N.J.S.A. 2C:12-3a), second-degree kidnapping (Second Count, N.J.S.A. 2C:13-1b), second-degree possession of a rifle for an unlawful purpose (Third Count, N.J.S.A. 2C:39-4a), two counts of third-degree possession of weapons with purpose to use unlawfully (Fourth and Fifth Counts, N.J.S.A. 2C:39-4d), fourth-degree aggravated assault (Sixth Count, N.J.S.A. 2C:12-1b(3)) and first-degree murder (Seventh Count, N.J.S.A. 2C:11-3). He was sentenced to custodial terms aggregating life imprisonment plus 16 years with parole ineligibility periods aggregating 32 1/2 years. On this appeal from the judgment, defendant urges:

*421 POINT I.
The defendant was entitled to relief from prejudicial joinder pursuant to Rule 3:15-2(b).
POINT II.
The New Jersey insanity statutes are unconstitutional.
POINT III.
Defendant's statement subsequent to his arrest should have been excluded.
POINT IV.
The trial court erred in failing to charge N.J.S.A. 2C:4-2.
POINT V.
The trial court erred in failing to charge the intoxification defense.
POINT VI.
Prosecutor's use of statements not in evidence in summation was prejudicial.
POINT VII.
Prosecutor's comments at sentencing were prejudicial. (Not raised below).
POINT VIII.
The sentence imposed was manifestly excessive.
The convictions result from two incidents precipitated by defendant's estrangement from his former girlfriend, Awilda Estevez, with whom he had a child. On May 14, 1982, defendant was in his car with Awilda. Notwithstanding her attempts to leave, defendant restrained her in the car and threatened her with a knife as they drove about for more than an hour and a half before defendant brought her home. On May 26, defendant came to Awilda's house. He was not permitted to enter and remained on the porch. The police were called. As the police arrived, defendant broke through a window and entered the house, where he was confronted by Awilda's father holding a machete. Defendant took the machete, struck the father and demanded to know where Awilda had gone; he also struck Awilda's mother. The police saw defendant swinging the machete and shot him. Awilda's father was found dead, the result of stab wounds to the lung and heart.
Defendant did not dispute the facts of the occurrences, but interposed the defenses of insanity and diminished capacity as to the May 26 occurrences. Dr. Seymour Kuvin, an examining psychiatrist, reported that defendant had an unstable family background, attended high school for only one year although he did subsequently get his GED in 1980, had a strong marijuana *422 habit and used cocaine and quaaludes, although less frequently. He had been employed but was laid off some time before the murder. The affair with Awilda was passionate and defendant was greatly upset as it broke up. He began to contemplate suicide and to increase his use of marijuana, other drugs and liquor. Defendant, armed with a rifle, went to Awilda's house on May 26 planning to manipulate her by telling her that he would kill himself if she would not return to him. He remembered breaking through the window but had little other recall of the homicide. At the time of his examination, Dr. Kuvin said, defendant was "markedly depressed" but with thinking, judgment and insight intact. Dr. Kuvin concluded that defendant was suffering from "depressive neurosis, to a suicidal degree," which he characterized as a mental "disease" or "disorder." On May 26, Dr. Kuvin opined, defendant suffered "an acute psychotic episode," at which time "his instinctual aggressive and sexual drives burst through uncontrolled." Defendant then had "no capacity because of this illness and defective reasoning for determining that he was doing anything wrong, legally or morally wrong"; it was "impossible for [defendant] to have acted purposely or knowingly." Dr. Kuvin pointed out that Dr. Seyere of Perth Amboy General Hospital had also made a diagnosis of depressive reaction and possible acute psychotic episode when defendant was being treated there immediately after the May 26 events. However, Dr. Kuvin testified that defendant was not insane or psychotic on the night of the kidnapping episode, May 14.
The State responded with the testimony of Dr. Irwin Perr, who found defendant to be suffering from an "adjustment disorder with mixed features" and possibly a "personality disorder." He characterized those conditions as a "mental disorder or mental dysfunction" but "[n]ot necessarily a mental disease." Dr. Perr concluded that at the time of the killing defendant was not laboring under such a disease or defect of the mind as to impair his ability to tell right from wrong; he *423 offered no opinion as to whether defendant's disorder made him unable to act purposely or knowingly.
At the close of all the evidence, defense counsel requested the trial judge to charge aggravated manslaughter (N.J.S.A. 2C:11-4a) and manslaughter (N.J.S.A. 2C:11-4b(1)). Counsel also requested that, with respect to the murder charge, the jury be instructed as to the substance of N.J.S.A. 2C:4-2:
Evidence that the defendant suffered from a mental disease or defect is admissible whenever it is relevant to prove that the defendant did not have a state of mind which is an element of the offense. In the absence of such evidence, it may be presumed that the defendant had no mental disease or defect which would negate a state of mind which is an element of the offense. Mental disease or defect is an affirmative defense which must be proved by a preponderance of the evidence.
The trial judge determined to charge murder, aggravated manslaughter and manslaughter and the defense of insanity (N.J.S.A. 2C:4-1). He refused, however, to charge the N.J.S.A. 2C:4-2 defense. In Point IV of his brief, defendant urges that refusal as error.
We are persuaded that defendant was entitled to the requested charge. We recognize that there is conflicting authority emanating from this court concerning the showing which must be made in order to permit the "diminished capacity" defense to be considered by the jury. In State v. Humanik, 199 N.J. Super. 283 (App.Div. 1985), certif. den. 101 N.J. 266 (1985), N.J.S.A. 2C:4-2 was read to require a defendant "to prove the existence of a mental disease or defect by a preponderance of the evidence." 199 N.J. Super. at 291. State v. Breakiron, 210 N.J. Super. 442 (App.Div. 1986), app. docketed # 25817, certif. granted ___ N.J. ___ (1986), on the other hand, specifically disagrees with Humanik and holds that a defendant
must prove more than that he suffered from some mental disease or defect. He must also prove that his condition negated the state of mind which is an element of the offense. 210 N.J. Super. at 452.
Breakiron further holds that the admissibility of diminished capacity evidence must first be evaluated by the trial judge:

*424 The judge, not the jury, must be persuaded by a preponderance of the evidence that the defendant suffered from a "mental disease or defect which would negate a state of mind which is an element of the offense." If the judge is so persuaded, the evidence is admissible and the State must then overcome it at trial beyond a reasonable doubt in order to establish the "state of mind which is an element of the offense." Id. at 449.
We need not join in the Humanik-Breakiron debate, for we are satisfied that under either approach defendant's diminished capacity defense should have been presented to the jury. Dr. Kuvin had unequivocally testified that defendant suffered from a mental "disease" which rendered it "impossible" for him "to have acted purposely or knowingly." Dr. Perr agreed that defendant was suffering from a mental "disorder" or "dysfunction." Although Dr. Perr said that condition was not "necessarily" a mental "disease," he expressed no opinion as to whether it negated either state of mind which is an element of a murder offense. The psychiatric testimony, together with the proofs as to defendant's personal background, his relationship with Awilda and the circumstances of the killing itself, could well justify a factfinder in concluding that defendant suffered from a mental disease or defect on May 26 and that he did not then have the requisite state of mind to commit murder as defined in N.J.S.A. 2C:11-3a(1) and (2). Accordingly, whatever test is used to assess the sufficiency of the proofs, we conclude that defendant was entitled to have the jury consider the diminished capacity defense defined in N.J.S.A. 2C:4-2.
The failure to so charge the jury cannot be construed as harmless error. To be sure, the jury was instructed that the State had the burden to prove beyond a reasonable doubt that defendant acted "purposely" or "knowingly" and was also given the opportunity to consider whether defendant acted "recklessly," either under circumstances manifesting extreme indifference to human life or otherwise. See N.J.S.A. 2C:11-4a, 4b(1); N.J.S.A. 2C:2-2b(3). But the jury might well have assessed defendant's state of mind differently had it been specifically instructed that the proofs concerning his mental condition *425 could bear on his ability to act purposely or knowingly; the charge as given suggested to the jury that if the proofs of mental condition did not sustain the N.J.S.A. 2C:4-1 insanity defense, they would not serve to mitigate defendant's responsibility. Consideration of the diminished capacity defense might well have led the jury to conclude that defendant acted only "recklessly" or, indeed, without any culpable state of mind. The trial judge's refusal to charge the substance of N.J.S.A. 2C:4-2 thus foreclosed the jury from considering a viable affirmative defense which could mitigate or remit defendant's criminal responsibility.
That error, of course, does not infect the convictions for terroristic threats and kidnapping arising out of the May 14, 1982 incidents, for there was no contention at trial that defendant was laboring under any mental disease or defect on that date. However, the error does require that we reverse not only the murder conviction but also the three convictions for weapons possessions and the aggravated assault conviction arising out of the May 26, 1982 incidents. All of those convictions are closely intertwined with the murder conviction and, excepting for the Sixth Count conviction, all similarly are predicated on findings that defendant acted purposely or knowingly.
In light of those conclusions, we need not address the contentions raised in Points II and V of defendant's brief. We are satisfied that, to the extent they bear upon the two convictions arising out of the May 14 incidents, the contentions advanced under Points I, III, VI, VII and VIII are clearly without merit. R. 2:11-3(e)(2).
The convictions and sentences for terroristic threats (First Count) and kidnapping (Second Count) are affirmed. The remaining convictions are reversed. The matter is remanded to the Law Division for new trial as to the Third, Fourth, Fifth, Sixth and Seventh Counts.