720 A.2d 401 (1998)
316 N.J. Super. 336
STATE of New Jersey, Plaintiff-Respondent,
v.
John Frank NATALUK, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued September 28, 1998.
Decided November 13, 1998.
*403 Ivelisse Torres, Public Defender, for defendant-appellant (Laura Lorenzo Milcsik, Designated Counsel, on the brief).
Peter Verniero, Attorney General, for plaintiff-respondent (Teresa A. Blair, Deputy Attorney General, of counsel and on the brief).
Before Judges SKILLMAN, PAUL G. LEVY and LESEMANN.
*402 LESEMANN, J.S.C. (temporarily assigned).
During the early morning hours on February 8, 1994, defendant fired two shots into the window of an unoccupied store. He then drove from the scene, ignoring police orders to stop while driving between twenty-five and forty miles per hour before stopping and surrendering. During the "chase" he threw away a gun later retrieved by the police.
As a result, defendant was indicted and, following trial, convicted of fourth degree criminal mischief, N.J.S.A. 2C:17-3a(1); second degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4a; third
degree eluding of police officers, N.J.S.A. 2C:29-2b; and (by a subsequent indictment and separate trial) a second degree violation of N.J.S.A. 2C:39-7, which prohibits possession of a weapon by someone who, like defendant, had been previously convicted of certain described offenses. He was sentenced to six months in prison on the criminal mischief conviction; to an extended term of fifteen years for possession of a weapon for an unlawful purpose; five years for eluding the police; and ten years for possessing a firearm notwithstanding his prior conviction, with all sentences to run concurrently.
At trial, defendant presented an insanity defense backed by psychiatric testimony. The trial judge properly submitted the insanity issue to the jury which, by finding defendant guilty, rejected the defense.
On appeal defendant claims that the trial court should also have submitted to the jury the issue of whether he suffered from a "mental disease or defect" which resulted in his lacking the requisite state of mind to render him guilty of the offenses charged. At trial defendant did not request such a diminished capacity charge but he claims now that the trial court's inaction on that issue was prejudicial and constituted plain error. In the alternative, he argues that his counsel's failure to request the charge deprived him of effective assistance of counsel and thus his convictions should be reversed for that reason. He also claims error in the trial court's rejection of certain additional psychiatric evidence and contends that his sentence is excessive.
We find that the failure to deliver the diminished capacity charge did constitute plain error and does require reversal of defendant's convictions. Accordingly, there is no need to address the claimed deprivation of effective assistance of counsel. We also conclude that the trial court's rejection of the additional psychiatric evidence was not error, but that certain aspects of the sentencing were erroneous.
At approximately 1:30 a.m. on February 8, 1994, defendant drove to store premises owned and operated by Louis Ciardi, a man with whom he had both a business and social *404 relationship. No one was in the premises and defendant fired two bullets through the window. He then returned to his car and, when entering the car, set off its alarm. Police responded and began following defendant, signaling him to stop as he drove from the scene. Defendant ignored the signals but did not speed up, nor did he make any attempt to lose the police car following him. Rather, he continued driving at approximately twenty-five miles per hour for a few minutes and then stopped. As the police approached his vehicle, however, he once again drove away, with the police again behind him, and with defendant still driving at a moderate speed of less than forty miles per hour. At one point defendant threw something after identified as a gunfrom the window of the vehicle. Eventually he pulled into a parking lot, stopped, and emerged from the car with his hands raised. He was then placed under arrest.
Defendant was polite and cooperative with the police. He said he had been having a "business relationship problem" with Mr. Ciardi, and he wanted to "let him know that he wasn't fooling around anymore, so he fired two shots into the business." He also said he had not stopped for the police because "he was scared."
At trial defense counsel submitted substantial evidence concerning defendant's mental condition. Defendant's mother described his attendance at a military academy at the age of eleven, after which his personality changed drastically. She said he became withdrawn and nervous and behaved erratically. She indicated that he had been physically abused at the academy but had insisted on remaining in the school because he wanted to pursue a military career.
She also described a serious motorcycle accident defendant suffered in 1976 which left him in a four-day coma and caused serious eye damage. She said his behavior also changed after that accident, and he sometimes became violent.
Louis Ciardi, the "victim" of the shooting also testified. He said he was unaware of any hostility between himself and defendant. He described a bizarre incident at his house, where defendant was a guest a few months before the shooting. Defendant wandered from the room where the two were sitting, returned with some milk he had apparently taken from Ciardi's refrigerator, told Ciardi he had thought he was in his mother's house and displayed an "emptiness" in his eyes and a vacant expression which made Ciardi uneasy.
Dr. Grigory Rasin, a psychiatrist, also testified on defendant's behalf. He referred to defendant's "traumatic adolescence," which involved physical and sexual abuse at the military academy. He also said that defendant had abused drugs and alcohol until 1991, and that conduct had adversely affected him and his personality. According to Dr. Rasin, however, the most significant factor relating to defendant's mental condition was his having previously suffered three severe head injuries. The first was the motorcycle accident in 1978, referred to by defendant's mother. He had suffered a second head injury when he was severely beaten sometime later, and finally, in 1993, he was in another accident in which he lost consciousness and was hospitalized. Dr. Rasin said that an M.R.I. of defendant's brain showed those injuries, with much of the damage being on the right side of the brain, in an area which is responsible for impulse control.
Dr. Rasin also said that defendant frequently experienced delusions and hallucinations. He concluded that defendant suffered from a bipolar disorder; a disassociative disorder; amnesia; and the results of his alcohol and drug abuse. He concluded that on the night in question, defendant was not aware of his actions and did not know that he had a weapon in his possession, or that he was firing the weapon, until the noise of the shots snapped him out of his disassociative status and back to reality. He said it was his opinion that defendant was insane at the time of the incident.
As noted, the jury convicted defendant of the four charges against him and thus, quite clearly, it rejected the insanity claim. The issue defendant now raises, diminished capacity, was not discussed nor was it submitted to the jury.

*405 I.

N.J.S.A. 2C:4-2 provides:
Evidence that the defendant suffered from a mental disease or defect is admissible whenever it is relevant to prove that the defendant did not have a state of mind which is an element of the offense. In the absence of such evidence, it may be presumed that the defendant had no mental disease or defect which would negate a state of mind which is an element of the offense.
The principle embodied in N.J.S.A. 2C:4-2, sometimes referred to as diminished capacity, bears some resemblance to an insanity defense, State v. Delibero, 149 N.J. 90, 692 A.2d 981 (1997), but the two are distinguishable. State v. Harris, 141 N.J. 525, 551-52, 662 A.2d 333 (1995). As the Court noted in State v. Reyes, 140 N.J. 344, 354, 658 A.2d 1218 (1995), "diminished capacity is a `failure of proof defense: evidence of defendant's mental illness or defect serves to negate the mens rea element of the crime." While the statute provides that without proof of the described "mental disease or defect," it may be presumed that the defendant had no condition "which would negate a state of mind which is an element of the offense," that provision goes only to the need for production of evidence and introduction of the diminished capacity issue. Whether or not there is evidence of such a state of mind, the State remains obligated to prove that defendant acted with the requisite mental state, and the defendant bears no such burden. If there is reasonable doubt as to whether defendant's mental condition permitted him to form the requisite knowledge or purpose which constitutes an essential element of the crime, the defendant is entitled to an acquittal. Ibid.; State v. Galloway, 133 N.J. 631, 628 A.2d 735 (1993).[1]
Not every mental condition qualifies under N.J.S.A. 2C:4-2 as a "disease or defect which would negate a state of mind which is an element of the offense." The condition must pertain to the existence or nonexistence of a state of mind prescribed by the code. Thus, a condition which results in uncontrollable rage or lack of control would not, by itself, negate a requisite mental condition such as knowledge or purpose. "[M]any mentally disturbed persons are [quite] capable of acting purposefully or knowingly in the minimal senses intended by" the statute. State v. Reyes, supra, 140 N.J. at 360, 658 A.2d 1218 (citing, American Law Institute, Model Penal Code and Commentaries, (Official Draft and Revised Comments), at 220, (comment to § 402) (1985)).
On the other hand, merely because a particular mental condition may "cause a loss of emotional control" does not mean that it could not also "affect a person's cognitive faculties" so as to negate the existence of a requisite mental condition. There is no formalization of
[an] impenetrable line ... between a mental disease affecting cognitive facilities and one affecting impulse control or emotions. Rather, [the principle is that] ... if the mental condition resulting in a rage and loss of control does not affect cognitive capacity sufficient to preclude the necessary mental state, it will not constitute diminished capacity.

[State v. Galloway, supra, 133 N.J. at 646-47, 628 A.2d 735.]
The rule, and the test, said the Court, is that,
a jury instruction is warranted when defendant has presented evidence of a mental disease or defect that interferes with cognitive ability sufficient to prevent or interfere with the formation of the requisite intent or mens rea. We now hold that all mental deficiencies, including conditions that cause a loss of emotional control, may satisfy the diminished-capacity defense if the record shows that experts in the psychological field believe that that kind of mental deficiency can affect a person's cognitive *406 faculties, and the record contains evidence that the claimed deficiency did affect the defendant's cognitive capacity to form the mental state necessary for the commission of the crime.
[Id. at 647, 628 A.2d 735.]
Here the evidence clearly satisfied that test.
First, we note that the requisite state of mind in order to warrant findings of guilt on the charges against defendant is "knowingly" or "purposely." N.J.S.A. 2C:2-2c(3) provides, that, unless the statute defining a particular crime specifies otherwise, guilt of a crime requires a showing that the defendant acted "knowingly."[2] There is no requirement of any such other state of mind in the statutes defining criminal mischief,[3] eluding a police officer, or the weapons offense charged here, and thus with respect to those offenses, "knowingly" is the applicable standard. With respect to the charge of possessing a weapon for an unlawful purpose, establishing guilt requires proof of that unlawful purpose.[4]State v. Dixon, 114 N.J. 111, 113, 553 A.2d 1 (1989); State v. Mello, 297 N.J.Super. 452, 467, 688 A.2d 622 (App.Div.1997)
Here, Dr. Rasin provided the expert testimony seemingly required by the Galloway holding. He testified that someone with the "defect or disease" from which defendant sufferedthe bipolar disorder, disassociative disorder and amnesia resulting from physical and sexual abuse, abuse of drugs and alcohol and three serious head injuries"can commit an act and not know he is committing the act while he is doing it but later remember it."
He also testified that, in his judgment, defendant was not aware of what he was doing when he possessed the gun and fired the bullets through the window. He believed that defendant had blacked out and did not even know that he had fired the gun. He said that, according to defendant,
he remembers that he took car keys and was getting in his car. And then the next thing he remembers is the noise of a gunshots, and he snap[ped] out of it and realized that he is holding a gun, which he has no [memory of] taking.
As he put it, defendant did not know what he was doing: "[H]e was neither aware of what he was doing as he was doing it, nor was he able to comprehend behavior or its consequences."
If defendant's testimony and that of Dr. Rasin are accepted, defendant would not be guilty of the crimes charged because he would not have acted knowingly or purposefully. While obviously the jury might reject defendant's testimony or that of his expert, the issue should have been submitted to the jury, particularly since the circumstances of the entire incident provide support for the doctor's diagnosis of mental defect or deficiency.
The entire factual pattern was bizarre. Defendant's actions simply made no sense. Dr. Rasin opined that defendant's complaint against Mr. Ciardi may well have been delusional and not grounded in reality. Certainly Ciardi was aware of no such complaint. When one considers also the strange behavior described by Ciardi just shortly before the shooting incident, and the inexplicable "slow chase" in which defendant refused to stop for the police officers but at the same time made no effort to elude them, a conclusion that defendant "suffered from a mental disease or defect" does not seem strained.
Since defendant did not request a charge dealing with diminished capacity, the failure to deliver such a charge can lead to reversal only if it constitutes plain error. R. 2:10-2. A finding of "plain error," in turn, must rest on a conclusion that the error is likely to have been prejudicial and to have *407 produced a prejudicial result. State v. Hock, 54 N.J. 526, 538, 257 A.2d 699 (1969), cert. denied, 399 U.S. 930, 90 S.Ct. 2254, 26 L.Ed.2d 797 (1970).
We are satisfied that is the case here. Defendant's mental condition was at the heart of the case. Even though the jury rejected the insanity claim, it is not inconceivable that it could have accepted the diminished capacity defenseor, to phrase the proposition more accurately, it could have concluded there was reasonable doubt as to whether defendant was aware of what he was doing and had the requisite state of mind for a finding of guilt on the charges against him. As this court said in State v. Serrano, 213 N.J.Super. 419, 517 A.2d 509 (App.Div.1986), certif. denied, 107 N.J. 102, 526 A.2d 175 (1987).
[t]he failure to so charge the jury cannot be construed as harmless error.... [Although] the jury was instructed that the State had the burden to prove beyond a reasonable doubt that defendant acted `purposely' or `knowingly' .... the jury might well have assessed defendant's state of mind differently had it been specifically instructed that the proofs concerning his mental condition could bear on his ability to act purposely or knowingly.

[Id. at 424-25, 517 A.2d 509.]
Further, as the Supreme Court has noted more than once, errors in charging the jury are "poor candidates for rehabilitation under the harmless error philosophy." See e.g., State v. Vick, 117 N.J. 288, 289, 566 A.2d 531 (1989).
In sum, the diminished capacity defense should have been submitted to the jury. The failure to do so constituted plain error. Accordingly, the convictions must be reversed and the matter remanded for further proceedings. That being so, there is no need to consider defendant's alternate contention that the failure of his counsel to raise the issue at trial should, by itself, be grounds to set aside the convictions by reason of inadequate representation of counsel.

II.
Defendant also claims error by reason of the trial court's refusal to admit testimony of Dr. Anita Sack as to defendant's mental condition. We find no error in that regard.
Dr. Sack's proffered testimony concerned defendant's mental condition in January 1996. It was rejected by the trial court because it did not relate to the date of the criminal incident, two years earlier. The court concluded that Dr. Sack's testimony was so remote as to be irrelevant, and defendant makes no compelling argument to the contrary. We agree with the trial court's conclusion and thus reject defendant's claim.

III.
Defendant further contends his sentence was excessive. In view of our conclusion that the convictions must be reversed, we need not resolve that issue. We do note, however, a number of errors or misstatements in the sentencing procedure. In the event that defendant is subject to re-sentencing following this remand, those matters should be addressed and corrected.
First, the trial court's exposition of its reasons for imposing an extended sentence on defendant as a persistent offender under N.J.S.A. 2C:44-3a is inconsistent with the principles of State v. Dunbar, 108 N.J. 80, 527 A.2d 1346 (1987). Dunbar makes clear that the determination to impose the extended term must focus "on the nature of the offenses committed and the defendant's propensities toward further dangerous, professional or persistent criminal conduct." Id. at 90, 527 A.2d 1346.
The sentencing court here explained its imposition of the extended term by stating that defendant's "violent history is escalating." It referred to defendant's "intimidating people by the use of firearms," concluding that his shooting at the store window was not "merely a property crime; it's an attempt to intimidate another human being."
That description does not accurately portray either defendant's past record or the events of February 8, 1994. Prior to the instant offenses defendant had been found *408 guilty of four indictable offensesall of a relatively minor nature. The trial court noted that he had been convicted of atrocious assault and battery, but did not note that that conviction had taken place in 1972over twenty years earlierand had resulted in only a six-month suspended sentence. No details were provided but the minimal nature of the penalty suggests something other than a vicious crime.
Defendant's other offenses included possession of twenty-five grams of marijuana in 1977, which led to his only imprisonmentan indeterminate term at the Youth Correctional Facility at Yardville. In May 1988, he was convicted of possession of a weapon without a permit and violation of the statute which prohibits persons with certain convictions to possess a weapon. The sentence was three years probation and a fine. Finally, in March 1994, he was convicted of resisting arrest and sentenced to one year's probation. We have no further information on any of those offenses.
It is unrealistic to characterize that record as one of "escalating" violence. Similarly, given the irrational nature of defendant's action here, and the unexplained shooting at an unoccupied building at 1:30 a.m., a characterization of that action as "an attempt to intimidate another human being" seems artificial.
Second, in weighing aggravating and mitigating factors, the sentencing judge indicated that the jury's rejection of the insanity defense was the equivalent of a conclusion that defendant did not suffer from any mental disease or defect and thus his mental condition could not constitute a mitigating factor on sentencing. That reasoning is unsound. While the jury obviously did not find "insanity" in the sense of a defense to the crimes charged, it does not follow from that conclusion that defendant was not suffering from mental problems. Indeed, even the State's expert did not dispute that proposition. It is difficult to understand how defendant's condition could not have constituted a mitigating factor.
Third, in dealing with the offense of eluding a police officer, the sentencing court referred to the involvement of police officers as constituting an aggravating factor. On appeal defendant correctly notes that the police involvement was an essential element of the offense itself and thus could not, by itself, constitute an aggravating factor.[5]
Finally, all in all, considering that the shots were fired at a vacant building in the middle of the night, that the eluding of a police officer did not actually involve eluding in any realistic sense, that the entire incident can only be described as irrational, a fifteen-year sentence (even without a parole disqualification) seems harsh indeed. Compare State v. Jefimowicz, 230 N.J.Super. 42, 51-54, 552 A.2d 638 (App.Div.), certif. denied, 117 N.J. 71, 563 A.2d 834 (N.J.), certif. granted, 117 N.J. 71, 563 A.2d 834 (1989), 119 N.J. 152, 574 A.2d 428 (1990). Whether its magnitude reaches the level of "shocking" so as to warrant reversal is, however, not something we need resolve now. State v. Roth, 95 N.J. 334, 365, 471 A.2d 370 (1984).
The matter is reversed and remanded for further proceedings consistent with this opinion.
NOTES
[1] For an analysis of these principles, contrasting the concept of diminished capacity with the affirmative defense of insanity, tracing the development of the present rule through its early stages, and discussing the effect of the decision in Humanik v. Beyer, 871 F.2d 432 (3d Cir.), cert. denied, 493 U.S. 812, 110 S.Ct. 57, 107 L.Ed.2d 25 (1989), see State v. Reyes, supra, 140 N.J. 344, 658 A.2d 1218. See also Cannel, New Jersey Criminal Code Annotated, comments 1-5 on N.J.S.A. 2C:4-2 (Gann 1997).
[2] In its definition of "knowingly," N.J.S.A. 2C:2-2b(2) says that "[a] person acts knowingly with respect to the nature of his conduct or the attendant circumstances if he is aware that his conduct is of that nature, or that such circumstances exist, or he is aware of a high probability of their existence."
[3] N.J.S.A. 2C:17-3, which defines "criminal mischief," refers to one who acts "purposely or knowingly."
[4] N.J.S.A. 2C:2-2b(1) provides that, "[a] person acts purposely with respect to the nature of his conduct or a result thereof if it is his conscious object to engage in conduct of that nature or to cause such a result."
[5] The State correctly notes, however, that the fifteen year extended term was not imposed for the eluding offense but rather for the offense of possessing a weapon for an unlawful purpose, and thus the improper "double counting" is of little, if any, practical effect.