**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1159-17T4

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

VERLANCE BUDDINGTON,

     Defendant-Appellant.

_____

Submitted October 16, 2018 – Decided  October 30, 2018

Before Judges Hoffman and Suter.

On appeal from Superior Court of New Jersey, Law Division, Hudson County, Indictment No. 15-05-0688.

Joseph E. Krakora, Public Defender, attorney for appellant (Rochelle Watson, Assistant Deputy Public Defender, of counsel and on the brief).

Esther Suarez, Hudson County Prosecutor, attorney for respondent (Svjetlana Tesic, Assistant Prosecutor, on the brief).

PER CURIAM

After pleading guilty to aggravated manslaughter pursuant to a plea agreement, and receiving a twenty-four-year prison term,[1] defendant filed this appeal, challenging the pretrial order permitting the admission of defendant's custodial statements for impeachment purposes, if he should testify. Defendant also appeals his sentence. We affirm.

On October 8, 2014, defendant shot and killed Hassan Byrd, who owed defendant $5000. After witness interviews and a surveillance video identified defendant as the shooter, the police arrested defendant inside a friend's apartment. The officers recovered a 9mm Springfield Armory XDM-9 handgun from the hallway outside of the apartment, inside of an empty diaper box. The shell casings recovered next to the victim were also 9mm. The police questioned defendant at the police station, where he confessed to the killing.

While court-ordered evaluations found defendant competent to stand trial, they also indicated defendant lacked the capacity to properly waive his Miranda[2] rights. The State therefore moved to admit defendant's custodial statement for impeachment purposes, should he testify at trial. The trial judge granted the

---

[1] Defendant's plea agreement provided for a recommended twenty-five-year prison term.

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

State's motion, finding "no evidence of police coercion," and that no "threats or promises were made to [d]efendant at any point during the interview." The judge noted the short length of the interrogation, and that "[w]hile [defendant's] intellectual disability is certainly a factor to be considered in the totality of the circumstances analysis, alone it is not determinative."

In his written opinion, the judge rejected defendant's argument that his custodial statements were involuntary, notwithstanding the fact that defendant did not make an intelligent and knowing waiver of his Miranda rights. Specifically, the judge cited to Colorado v. Connelly, 479 U.S. 157 (1986) and State v. Smith, 307 N.J. Super. 1 (App. Div. 1997) in reasoning that "police coercion is a necessary predicate to a finding that a statement is involuntary," and that in this case there was "no evidence of police coercion." The judge found no "threats or promises . . . made to [d]efendant at any point during the interview," along with the facts that the interview lasted approximately twenty minutes, and that the police were not aware of defendant's intellectual disabilities during the interrogation. Therefore, the judge held that defendant's custodial statements were admissible for impeachment purposes, should defendant testify at trial.

On June 1, 2017, the court sentenced defendant to twenty-four years in prison subject to an eighty-five percent parole ineligibility period. This appeal followed.

On appeal, defendant presents the following arguments:

POINT I

THE STATE, HAVING CONCEDED THAT DEFENDANT'S INTELLECTUAL AND COGNITIVE IMPAIRMENT RENDERED HIM INCOMPETENT TO WAIVE HIS MIRANDA RIGHTS, SHOULD NOT BE ALLOWED TO USE DEFENDANT'S STATEMENT FOR IMPEACHMENT PURPOSES DURING CROSS-EXAMINATION.

POINT II

DEFENDANT'S SENTENCE OF TWENTY-FOUR YEARS FOR AGGRAVATED MANSLAUGHTER IS MANIFESTLY EXCESSIVE AND THE RESULT OF AN IMPROPER ASSESSMENT OF MITIGATING FACTOR FOUR.

I

We first address defendant's challenge to the trial court's ruling allowing the admission of his custodial statements for impeachment purposes. In reviewing a trial court's admission of a defendant's confession, our task is to "engage in a 'searching and critical' review of the record to ensure protection of a defendant's constitutional rights." State v. Maltese, 222 N.J. 525, 543 (2015)

(quoting State v. Hreha, 217 N.J. 368, 381-82 (2014)).  We defer to the factual findings of the trial court so long as those findings are supported by sufficient evidence in the record.  State v. Gamble, 218 N.J. 412, 424 (2014) (citation omitted).  Our review of the trial court's legal conclusions, however, is plenary. State v. Gandhi, 201 N.J. 161, 176 (2010) (citation omitted).

Defendant argues the trial judge erred in his determination that "evidence of police coercion was an absolute prerequisite to [a] finding of involuntariness[,] and the absence of such police coercion was dispositive of the inquiry."  Defendant contends the judge should have found his custodial statements were involuntary, based on his intellectual impairments, which caused the questioning by police to be coercive.  We disagree.

New Jersey has long "adopted and employed the impeachment exception [to the exclusionary rule] set forth in Harris."  State v. Burris, 145 N.J. 509, 524 (1996) (citing Harris v. New York, 401 U.S. 222 (1971)) (other citations omitted). The impeachment exception maintains the inadmissibility of evidence subject to the exclusionary rule in a prosecution's case-in-chief, but admits the otherwise excluded evidence during defendant's cross-examination, should defendant take the stand.  New Jersey jurisprudence has "recognized and accepted the Supreme Court's use of the impeachment exception in cases

involving constitutional violations, as well as <u>Miranda</u> violations of the privilege against self-incrimination." <u>Ibid.</u> (citation omitted).

"The impeachment exception is strictly limited to situations in which the suppressed statement is trustworthy and reliable in that it was given freely and voluntarily without compelling influences." <u>Id.</u> at 525 (citing <u>Mincey v. Arizona</u>, 437 U.S. 385, 397-98 (1978)).

> The United States Supreme Court observed that a determination of whether a statement is voluntary entails a factual inquiry. It requires careful evaluation of all the circumstances of the interrogation, and, <u>ultimately, the question is whether the defendant's will was overborne</u>. <u>Mincey</u>, 437 U.S. at 397-98. The Supreme Court has recognized that if the defendant's will was overborne, the confession is not the "product of a rational intellect and a free will." <u>Blackburn v. Alabama</u>, 361 U.S. 199, 208 (1960). A confession that is not the product of such "rational intellect" and "free will" is involuntary and is violative of the Due Process Clause of the Fourteenth Amendment. <u>Townsend v. Sain</u>, 372 U.S. 293 (1963) [(other citations omitted)].
>
> [<u>Id.</u> at 525-26 (emphasis added).]

Our Supreme Court has repeatedly emphasized how to analyze voluntary confession cases, explaining,

> [T]he State must demonstrate the voluntariness of a confession beyond a reasonable doubt. <u>State v. Galloway</u>, 133 N.J. 631, 654 (1993). An involuntary confession can result from physical and psychological coercion. <u>Ibid.</u> Confessions are not voluntary if derived from "very substantial" psychological pressures that overbear the suspect's will. <u>Id.</u> at 656.

6

In determining whether a defendant's will was overborne, the totality of the circumstances must be examined, "including both the characteristics of the defendant and the nature of the interrogation." Id. at 654. Relevant factors include "the suspect's age, education and intelligence, advice concerning constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature, and whether physical punishment and mental exhaustion were involved." Ibid. [(other citations omitted)].

[State v. Cook, 179 N.J. 533, 562-63 (2004).]

Here, defendant provides no meritorious support or reasoning for his argument that evidence of police coercion is not a prerequisite to a finding of involuntariness. To the contrary, the United States Supreme Court held that "[a]bsent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law." Connelly, 479 U.S. at 164. The Connelly Court acknowledged the uptick of interrogators' "more subtle forms of psychological persuasion," and responded that "this fact does not justify a conclusion that a defendant's mental condition, by itself and apart from its relation to official coercion, should ever dispose of the inquiry into constitutional 'voluntariness.'" Ibid. This court has adopted Connelly's holding. Smith, 307 N.J. Super. at 10 (quoting Connelly, 479 U.S. at 167 ("[C]oercive police activity is a necessary predicate to the finding that a confession is not "voluntary" within the meaning of the Due Process Clause of the Fourteenth Amendment.")).

7

Defendant cites to <u>United States v. Preston</u>, 751 F.3d 1008 (9th Cir. 2014) as a case where the court "examined the coerciveness of police interrogation techniques through the lens of defendant's mental illness and ruled that his statement was involuntary." However, in <u>Preston</u> the Ninth Circuit found multiple instances of improper interrogation techniques by the police, threats of continued questioning, "multiple deceptions" by the officers, "false promises of leniency and confidentiality," and other forms of police misconduct, leading the court to conclude that defendant's "will was overborne and his statement involuntary." <u>Id.</u> at 1023-28.

Defendant's only assertion of police misconduct during the custodial interrogation took place when the police began discussing the events that led up to Byrd's killing, and the following colloquy occurred:

A:     I came around there early, like around that time.

Q:     It was around? Well, we got you on camera, sometime I guess it was around, 9:22 . . . .

A:     Yeah.

Q:     Okay and then what . . . happens then?

A:     Went around it.

Q:     Went around where?

A:     Woodlawn.

Q:     Okay. You and him had words again?

A:    Yeah, man.

Q:    What did he say this time?  Did he continue to threaten you?

A:    Yeah.

Q:    And then what?

A:    That's all that happened.

Q:    <u>We can't even though we know what happened. We can't . . . put words into your mouth.  We can't tell you, we have to have you tell us even though we know, you know.  It's just the way it is.</u>

A:    That's all that happened.

Q:    Did he threaten you today?

A:    Yeah, he threatened me.

[(emphasis added)]

Defendant then continued to answer the officers' questions, and it was not until more than twenty questions and twenty answers later that defendant made inculpating statements.  On appeal, defendant argues:

> The officer's explanation of 'the way it is' compelled [defendant] to continue with the interrogation.  For a suspect of [defendant]'s cognitive limitations, the police representation that although they were aware of what happened they needed to hear it from [defendant], may have led him to believe that the police had all the inculpatory evidence, and the interrogation was simply an exercise in hearing it from his lips.

9

By the time of the custodial interrogation, however, the police had already tracked down defendant from the crime scene to the apartment where he was apprehended. At the apartment, they recovered a gun in a box in the hallway outside the apartment where defendant was found. Witness interviews identified defendant as the shooter. Thus, the officers had enough evidence to know that defendant knew more than his assertion – "[t]hat's all that happened" – and therefore reasonably continued to question defendant. Moreover, by this time defendant already acknowledged that he met with Byrd on the day of the incident, and that Byrd threatened him. After defendant said "that's all that happened" a second time, the officers asked more than twenty questions seeking additional details about this encounter and defendant's history with Byrd. In other words, the officers responded to "[t]hat's all that happened" with further questions regarding information already given in the interrogation, rather than repeating the same questions or pushing defendant further along in the story. Ultimately, defendant's assertion he was compelled to continue with the investigation is meritless, as it falls far short of the Court's standard that "'very substantial' psychological pressures that overbear the suspect's will" must be found in ruling that an involuntary confession occurred. Cook, 179 N.J. at 563 (quoting Galloway, 133 N.J. at 656).

The record supports the trial judge's finding of "no evidence of police coercion," and that no "threats or promises were made to [d]efendant at any point during the interview." The judge noted the short length of the interrogation, and that "[w]hile [defendant's] intellectual disability is certainly a factor to be considered in the totality of the circumstances analysis, alone it is not determinative," a rationale consistent with this court's finding in <u>Smith</u>.

Furthermore, the record shows defendant's statements were not only voluntary, but also reliable, as all material statements find corroboration in the record. Defendant stated that he walked down Ocean Avenue and to his friend's apartment – this was corroborated by the surveillance video and the fact that defendant was arrested at the apartment. Defendant's statement of where he hid the gun was corroborated by the fact the police found it at the stated location. Defendant told the story multiple times during the interrogation, with no inconsistencies. Defendant knew Byrd as "Hass," a shortened version of his first name "Hassan." Defendant also discussed his custodial interrogation with Dr. Cook, stating that his attorney told him that he should not have said anything; however, there was no indication he recanted anything he said in the interrogation. We therefore hold that the trial court correctly ruled that defendant's statements made at the custodial interrogation were voluntary, and therefore are within the impeachment exception to the exclusionary rule.

11

II

Defendant next argues he received an excessive sentence, asserting the trial court erred in failing to apply mitigating factor four, and in failing to apply aggravating factors three, six, and nine "through the lens of defendant's cognitive, mental, and psychiatric defects."

Our Supreme Court has repeatedly held that sentencing determinations are reviewed on appeal with a highly deferential standard. State v. Fuentes, 217 N.J. 57, 70 (2014). Specifically the Court has articulated:

> The appellate court must affirm the sentence unless (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience."
>
> [Ibid. (quoting State v. Roth, 95 N.J. 334, 364-65 (1984) (alteration in original)).]

When determining a sentencing term, a trial court must identify whether any of the aggravating factors enumerated in N.J.S.A. 2C:44-1(a) or the mitigating factors in N.J.S.A. 2C:44-1(b) apply, and then balance the applicable factors. Id. at 72. The relevant factors must then be "qualitatively addressed and assigned appropriate weight in a case-specific balancing process." Id. at 72-73 (citing State v. Kruse, 105 N.J. 354, 363 (1987)). The court must also "state

12

reasons for imposing such sentence including . . . the factual basis supporting a finding of particular aggravating or mitigating factors affecting sentence…." R. 3:21-4(g). It is especially important that the court provide a "clear explanation 'of the balancing of aggravating and mitigating factors with regard to imposition of sentences and periods of parole ineligibility . . . .'" Fuentes, 217 N.J. at 73 (quoting State v. Pillot, 115 N.J. 558, 565-66 (1989)) (other citations omitted).

In sentencing defendant, the court found significant the following aggravating factors: 1) the risk of re-offense (factor three); 2) the extent of defendant's prior criminal record and the severity of those offenses (factor six); and 3) the need for deterrence (factor nine). See N.J.S.A. 2C:44-1(a)(3). At defendant's request, the judge considered the mitigating factor of substantial grounds tending to excuse or justify the defendant's conduct (factor four), but declined to apply it. See N.J.S.A. 2C:44-1(b)(4).

On appeal, defendant first contends that mitigating factor four "applies due to [defendant's] documented intellectual and cognitive deficits." Defendant's cases in support of his argument are clearly distinguishable: State v. Hess, 207 N.J. 123, 129 (2011) concerned a defendant who "suffered from Battered Women's Syndrome when she killed her husband"; State v. Nataluk, 316 N.J. Super. 336, 342-43 (App. Div. 1998) involved a defendant who "previously suffered three severe head injuries," "frequently experienced

13                                                                    A-1159-17T4

delusions and hallucinations," and whose expert doctor opined "defendant was insane at the time of the incident"; and in State v. Nayee, 192 N.J. 475 (2007), the Supreme Court summarily remanded the case "solely to the issue of the trial court's refusal to consider the record before it in respect of defendant's mental illness as a mitigating factor under N.J.S.A. 2C:44-1b(4) in arriving at its sentence."

In this case, however, the trial judge stated, "I certainly accept and acknowledge that you have issues, mostly cognitive in nature." He then explained to defendant,

> But I have to weigh that against the facts and circumstances in this case. Whatever those cognitive deficiencies are, [it] certainly doesn't convince me at all that it [a]ffected your ability to understand and appreciate what you did in October 2014, when you took that gun out and fired it multiple times at an unarmed man.

> The result was all but certain. There's nothing before me that in any [way] begins to excuse, minimize or explain your conduct. You are a seasoned veteran in the juvenile justice system by the time you took the gun out. You had been arrested twice as an adult for indictable charges. You knew what you were doing. You knew the results that were going to occur.

The judge then acknowledged defendant and Byrd's relationship, and defendant's clear intentions on the day of the incident, stating:

> Certainly . . . that again doesn't excuse this conduct. It doesn't minimize it. . . . You shot him five times. And

14

then . . . . [y]ou ran and you hid, because you knew what you did was wrong. You tried to hide the gun so nobody would find it. . . . All indicating to me you well knew what you were doing when you did that.

Whatever shortcomings you may have had in life, I don't believe [a]ffected your decision one bit that day. So I clearly don't find mitigating factors three or four apply here.

The judge clearly considered defendant's cognitive disabilities under mitigating factor four, and weighed it against the facts of the case and language of the statute. We find no basis to disturb his decision not to apply mitigating factor four.

Second, defendant argues that "while aggravating factors three, six, and nine are applicable, they must be considered through the lens of defendant's cognitive, mental, and psychiatric deficits." Defendant fails to provide any legal support for this assertion. Moreover, as explained above, the judge did consider defendant's cognitive disabilities. He then provided ample reasons as to his rationale for applying factors three, six, and nine.

Finally, it should be noted that in his plea form, under "[s]pecify any sentence the prosecutor has agreed to recommend," defendant wrote that he "will plead guilty to [count one] as amended to . . . [aggravated] manslaughter[, and] in exchange the state will seek [a twenty-five-year sentence] . . . ." Defendant

was ultimately sentenced to twenty-four years in prison subject to an eighty-five percent parole ineligibility period.

We conclude the sentencing court applied correct legal principles and its findings regarding aggravating and mitigating factors are fully supported by the record. See State v. Megargel, 143 N.J. 484, 493-94 (1996). We find no clear error of judgment in the court's application of the facts to the law that would shock our conscience. See id. at 393 (citation omitted). Accordingly, we find no abuse of discretion in the imposition of an extended term or the particular sentence imposed here. See State v. Pierce, 188 N.J. 155, 166 n.4 (2006) (citation omitted); see also State v. Hudson, 209 N.J. 513, 526 (2012) (citation omitted).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION