**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3931-18

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

ALEXANDER J. CICCOLELLO, SR.,

     Defendant-Appellant.

_____

Submitted October 18, 2021 – Decided January 11, 2022

Before Judges Rothstadt, Mayer and Natali.

On appeal from the Superior Court of New Jersey, Law Division, Ocean County, Indictment No. 17-08-1210.

Joseph E. Krakora, Public Defender, attorney for appellant (Melanie K. Dellplain, Assistant Deputy Public Defender, of counsel and on the briefs).

Bradley D. Billhimer, Ocean County Prosecutor, attorney for respondent (William Kyle Meighan, Supervising Assistant Prosecutor, of counsel and on the brief; Samuel Marzarella, Chief Appellate Attorney, of counsel).

PER CURIAM

Defendant Anthony Ciccolello, Sr. appeals from his convictions and aggregate eight-year, extended term sentence that was subject to a four-year period of parole ineligibility, for having committed third-degree theft, N.J.S.A. 2C:20-3(a), and third-degree burglary, N.J.S.A. 2C:18-2(a)(1) at a motel room in Seaside Heights. On appeal, defendant argues

POINT I

THE COURT'S DENIAL OF EXCULPATORY DEFENSE WITNESSES VIOLATED [DEFENDANT'S] CONSTITUTIONAL RIGHTS TO DUE PROCESS AND A FAIR TRIAL.

POINT II

THE COURT COMMITTED PLAIN ERROR WHEN IT FAILED TO CHARGE THE JURY ON: (1) THE LESSER-INCLUDED OFFENSE OF CRIMINAL TRESPASS; AND (2) PRIOR CONTRADICTORY STATEMENTS OF WITNESSES. (NOT RAISED BELOW).

    A. THE COURT'S FAILURE TO CHARGE THE JURY ON THE LESSER-INCLUDED OFFENSE OF CRIMINAL TRESPASS WAS PLAIN ERROR.

    B. THE COURT'S FAILURE TO CHARGE THE JURY ON PRIOR CONTRADICTORY STATEMENTS OF WITNESSES WAS PLAIN ERROR.

2

POINT III

THE IMPROPER LAY-WITNESS OPINION TESTIMONY AS TO THE CONTENT OF THE SURVEILLANCE VIDEOS AND THE IDENTITY OF THE SUSPECTS WAS PLAIN ERROR. (NOT RAISED BELOW).

POINT IV

[DEFENDANT] WAS DEPRIVED OF HIS CONSTITUTIONAL RIGHTS TO DUE PROCESS AND A FAIR TRIAL THROUGH THE TRIAL COURT'S ADMISSION OF THE FOLLOWING PRIOR-BAD-ACT EVIDENCE: (1) POLICE OFFICER TESTIMONY THAT THE OFFICER KNEW [DEFENDANT] FROM PREVIOUS ENCOUNTERS; (2) POLICE OFFICER TESTIMONY THAT [DEFENDANT] LIVED IN A "NOTORIOUS PROBLEM" AREA; AND (3) INTRODUCTION OF FINGERPRINT EVIDENCE WITHOUT THE APPROPRIATE LIMITING INSTRUCTION. (NOT RAISED BELOW).

    A. THE COURT IMPROPERLY ADMITTED TESTIMONY THAT DETECTIVE BLOOMQUIST KNEW [DEFENDANT] FROM PRIOR ENCOUNTERS.

    B. OFFICER PASIEKA'S TESTIMONY THAT DEFENDANT WAS IN A "NOTORIOUS PROBLEM" AREA WAS IRRELEVANT AND HIGHLY PREJUDICIAL.

    C. THE COURT'S FAILURE TO PROVIDE A LIMITING INSTRUCTION ON FINGERPRINT EVIDENCE WAS PLAIN ERROR.

A-3931-18

POINT V

THE CUMULATIVE EFFECT OF THE EVIDENTIARY AND INSTRUCTIONAL ERRORS NECESSITATES REVERSAL OF [DEFENDANT'S] CONVICTIONS.  (NOT RAISED BELOW).

POINT VI

[DEFENDANT'S] SENTENCE IS EXCESSIVE BECAUSE THE COURT IMPROPERLY REJECTED MITIGATING FACTOR FOUR.

We are not persuaded by any of defendant's contentions.  For the reasons that follow, we affirm defendant's convictions and sentence.

I.

The facts adduced from the record are summarized as follows.  Mitchell Andryszewski and Rodney Smith lived in a motel room in Seaside Heights. Their friend, defendant's son Alexander Ciccolello Jr., stayed with them during the month of November 2016.  After arriving, Alexander[1] left for a couple days before returning around Thanksgiving.  During the time he was away, Smith received a phone call from an individual who identified himself as defendant. During the call, the individual stated Smith "owed [Alexander] money and [he] needed to pay it back," but the caller did not say why Smith owed money or the

---

[1]  We refer to defendant's son by his first name to avoid any confusion caused by his and defendant's common name.

amount of the alleged debt. The phone call did not "make any sense" to Smith because he did not owe Alexander money. After Alexander returned for a brief period and then moved out on November 28, without returning his room key, he had no further contact with Andryszewski or Smith.

During the afternoon of December 1, 2016, Andryszewski and Smith had left their room for the day, locking their door behind them. When Andryszewski returned at around midnight, he noticed the door was unlocked but there was no noticeable damage to the front door or windows.

Upon entering the apartment, Andryszewski observed that the walls of the motel room had been spray painted and that several electronics, including video gaming consoles, video games, a television, and a laptop were missing, the total value of which being approximately $1,500. Andryszewski then went to the motel's main office and reported the break-in to the motel's manager, who called the police.

At approximately 12:40 a.m., Officer Sean Varady of the Seaside Heights Police Department (SHPD) responded to the call. After speaking with Andryszewski, Varady investigated the motel room and observed "a large amount of spray paint covering the walls, the furniture[,] and the appliances and cabinetry in the kitchen area." He found the words "pay your drug debts," were

5

spray painted on the walls in one room, and, in another, the words "Blood rules" were painted on the wall. Varady also found a green pocketknife with the letter "A" imprinted on it that was left in a crib used by Smith's child, a yellow rubber glove left on one of the victim's beds, and more yellow rubber gloves left in a small waste bin with a can of red spray paint that would later be identified as bearing defendant's fingerprint.

Earlier in the evening, at approximately 6:55 p.m., SHPD Officer Edward Pasieka conducted a motor vehicle stop of a white, four-door Mercedes. Pasieka initially saw the vehicle leaving the area of the motel and wanted to "check it out" because he had never seen the car there before and the area had been "a notorious problem" area for the SHPD. Pasieka stopped the Mercedes when it failed to completely stop at a stop sign and made a right turn without signaling.

According to Pasieka, four people were in the vehicle: defendant, Alexander, John Peccoreno, and the driver, Alexander's girlfriend, Angela Dowling. After speaking with the driver of the vehicle, Pasieka released the vehicle without issuing a ticket. The four of them eventually returned to Peccoreno's residence at another motel.

Later in his shift, Pasieka informed Detective Sergeant Luigi Violante and Detective Daniel Bloomquist about the stop. The two detectives conducted

further investigation into the break-in, and, based on the evidence they collected, including video footage from surveillance cameras, on February 7, 2017, they arrested defendant and the others involved.

A grand jury later indicted defendant, Alexander, and Peccoreno, charging them with burglary and theft.[2] Thereafter, Alexander pleaded guilty to criminal trespass, N.J.S.A. 2C:18-3, and provided a statement in which he inculpated defendant, which was inconsistent with an initial statement to police that exculpated defendant. Peccoreno pleaded guilty to burglary pursuant to a plea agreement, and similarly gave an initial statement that exculpated defendant, but later gave another that inculpated defendant. Peccoreno agreed to provide truthful testimony at defendant's trial.

Prior to trial, defendant chose to act as his own attorney and waived his right to counsel, but later agreed to accept the services of standby counsel and then be completely represented by trial counsel. Thereafter, at the conclusion of defendant's trial, the jury returned its verdict finding defendant guilty of both charges. Later, the trial judge imposed defendant's sentence and entered a judgment of conviction on February 11, 2019. This appeal followed.

---

[2] In a third count, defendant was also charged with third-degree possession of a controlled dangerous substance, N.J.S.A. 2C:35-10(a)(1), but later, on the State's motion, that charge was dismissed before trial.

## II.

In Point I of his brief, defendant contends he "was deprived of his rights to due process and a fair trial" when the trial judge denied his request to have his physicians, his son, and his fiancée, Patricia Ucci, testify in his defense. He argues the trial judge disregarded his obligation to explore alternative solutions to the witnesses' exclusion prior to "invoking the ultimate sanction of barring" them. We disagree.

### A.

On November 27, 2018, prior to the beginning of trial, the trial judge held a hearing to determine which of the parties' respective witnesses would testify at trial. Defendant, appearing pro se at the time, indicated he intended to call as witnesses Dr. Mehta, Dr. Morris Antebi, Ucci, and Alexander as an alibi witness.

According to defendant, the purpose of calling his physicians would be "to have them opine that [he] could not have engaged in [the theft or burglary] because of [his] physical limitations." Dr. Mehta would testify that defendant had suffered complications from a liver treatment and that she instructed him not to lift weight and to be careful with exercising or climbing stairs. Similarly, he indicated Dr. Antebi would testify he treated defendant for more than four years for a knee replacement and "degenerative [osteoporosis] of arthritis" for

which Antebi ordered physical therapy and pain medication. Notably, at the time the trial judge considered whether to allow the doctors to testify, defendant, for about two months prior, represented to the judge and the State that he would provide medical records related to his case and produced nothing.

After considering the matter, the trial judge denied defendant's request to have his doctors testify. The judge determined the only form of relevant testimony that defendant could extract from the doctors would be a medical opinion that defendant was not capable of engaging in the physical activity that was involved in the burglary due to his condition—testimony that would be "getting into the area of expert opinion." Further, he reasoned defendant produced no medical records or reports prepared by either doctor.

As for Ucci, defendant indicated she lived with him half of the time, regularly cleaned his house due to his medical limitations, and cleaned out his apartment after defendant was arrested. Defendant told the judge that Ucci would testify that she saw two spray paint cans in defendant's apartment under his sink and that, when she cleaned defendant's apartment after he was arrested, the paint cans were missing. Defendant claimed Ucci would also testify that Alexander had access to the paint cans and that he could have removed the cans from defendant's apartment and "planted" them at the crime scene. In response

A-3931-18

to the judge's questioning, defendant conceded Ucci would not be able to say she saw anyone take the paint cans.

With that, the judge barred Ucci from testifying, ruling that her testimony was not relevant, as she could not testify she witnessed anybody take the paint cans and could not provide any firsthand knowledge surrounding the burglary. He suggested to defendant that, if anything, defendant's description of Ucci's testimony would "establish the counter-proposition that the paint cans . . . that had [been] underneath the sink were no longer there and at least one of them was found at the scene." He also stated defendant was "engaging in conjecture" by seeking to offer her testimony to show someone else might have taken the paint can and placed it at the scene of the crime, because Ucci could not say she saw anyone take the paint cans and had no firsthand knowledge of the facts.

As to Alexander testifying, defendant relied upon the first of two statements Alexander, who already pleaded guilty, gave to police in which he stated he dropped defendant off at a CVS and defendant was at the CVS during the burglary. Defendant conceded the last time he spoke to his son, which had not been for months, his son did not want to testify. Defendant only thought Alexander would "testify as an alibi witness" and wanted to "try to get [Alexander] to testify." However, defendant also indicated he wanted to cross-

10

examine Alexander regarding his second statement given under oath at his plea hearing, which was inconsistent with his first and inculpated defendant. The State objected to defendant's request to call Alexander as an alibi witness because defendant never provided the State with notice as required by Rule 3:12-2.

In response, the judge asked standby counsel whether defendant communicated to him an intention to call Alexander as an alibi witness, to which counsel indicated defendant did not. The judge instructed both parties to search their respective files for any notice defendant may have sent to the State and indicated the issue would be addressed at the end of the hearing. When neither party found any such communication by the end of the day, the judge stated, "we'll leave that open until tomorrow. I'm going to give you an opportunity."

Notwithstanding the deferral of the issue, the next day defendant relinquished his self-represented status in favor of accepting trial counsel's services, and neither defendant nor counsel argued Alexander should be permitted to testify, nor did defendant provide any document sent to the State communicating an intent to call Alexander as an alibi witness.

11

## B.

Our review of a trial judge's evidential rulings is limited. State v. Buckley, 216 N.J. 249, 260 (2013) (quoting State v. Buda, 195 N.J. 278, 294 (2008)). They will "be upheld 'absent a showing of an abuse of discretion' or 'a clear error of judgment.'" State v. Lora, 465 N.J. Super. 477, 492 (App. Div. 2020) (quoting State v. Perry, 225 N.J. 222, 233 (2016)). We will find an abuse of discretion only where "a decision is 'made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'" State v. R.Y., 242 N.J. 48, 65 (2020) (quoting Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561, 571 (2002)). Even if we disagree with the trial judge's conclusions, we will not substitute our own judgment for that of the trial judge unless the judge's ruling was "so wide of the mark that a manifest denial of justice resulted." Lora, 465 N.J. Super. at 492 (quoting Perry, 225 N.J. at 233).

In determining whether to bar a defense witness from testifying, courts recognize that "the sanction of preclusion is a drastic remedy and should be applied only after other alternatives are fully explored." State v. Washington, 453 N.J. Super. 164, 190 (App. Div. 2018) (quoting State v. Scher, 278 N.J. Super. 249, 272 (App. Div. 1994)); see also State v. Dimitrov, 325 N.J. Super. 506, 511 (App. Div. 1999); Zaccardi v. Becker, 88 N.J. 245, 253 (1982)

(explaining "although it is the policy of the law that discovery rules be complied with, it is also the rule that drastic sanctions should be imposed only sparingly"). When adjournment of the trial will avoid the risk of prejudice resulting from untimely discovery, trial judges have discretion to choose that option rather than suppression. See State v. Utsch, 184 N.J. Super. 575, 580 (App. Div. 1982).

Here, defendant largely relies on our opinion in Dimitrov to support his contention that all his proposed witnesses should have been allowed to testify. However, his reliance is misplaced.

In Dimitrov, we reversed a defendant's conviction after the trial judge denied the defendant's request to present a potentially exculpatory witness on the grounds that the defendant's counsel neglected to present an investigative report regarding the witness in a timely manner. 325 N.J. Super. at 511-12. There, defense counsel provided a report concerning a previously undisclosed fact witness to the State on the morning of the first day of trial. Id. at 509. The State objected to allowing the witness to testify that day on the grounds that the witness added new facts which required further investigation and because the defendant's counsel possessed the report several weeks prior to the start of the trial. Id. at 509-10.

In our opinion, we observed defense counsel deviated from his discovery obligations to the State. Nevertheless, we also detailed several factors we found persuasive in determining the trial judge should have granted a continuance instead of barring the witness outright. Id. at 511. First, we noted the State did not press for the exclusion of the witness's testimony. Ibid. Rather, the trial judge suppressed the witness sua sponte after the State simply requested a week-long adjournment to meet the defendant's new proofs. Ibid. Additionally, we observed the State had incurred costs in acquiring a necessary interpreter on the date of the trial, and we stated assessing the costs of rescheduling against defense counsel personally was a preferable sanction to precluding the testimony of a witness who could potentially provide exculpatory testimony. Id. at 511-12.

In the present case, the facts are totally different. First, as to the doctors, assuming their testimony was relevant at all to defendant's defense, he never provided any medical records or reports from his proffered physicians. "[A] treating physician may be permitted to testify as to the diagnosis and treatment of his or her patient pursuant to N.J.R.E. 701." Delvecchio v. Twp. of Bridgewater, 224 N.J. 559, 578 (2016). However, "[u]nless the treating physician is retained and designated as an expert witness, his or her testimony

is limited to issues relevant to the diagnosis and treatment of the individual patient." Id. at 579. Accordingly, where a party seeks to have their physician testify to topics beyond the scope of diagnosis and treatment, the physician's testimony must conform to the rules regarding expert testimony in N.J.R.E. 702 and 703. Ibid.; see also R. 3:13-3(b)(2) (requiring in criminal cases disclosure of expert opinion evidence during pretrial discovery).

Here, defendant sought to have his doctors not only testify to his physical problems and their treatment of him, but also to introduce their alleged opinion that he could not have physically committed the subject burglary and theft, a topic clearly beyond their diagnosis and treatment. Without defendant serving medical reports and records during discovery, he was not entitled to have the doctors testify to that opinion.

Assuming the doctors even agreed with defendant's understanding of their opinion and would provide a report to that effect, the trial judge had already allowed defendant time to permit him to provide medical evidence which he failed to deliver despite the additional time. As the judge already explored alternatives, suppressing the doctors' testimony was a reasonable sanction, considering defendant's delay and the State's objection to these witnesses.

As to defendant's contention the trial judge improperly barred Alexander from testifying as an alibi witness, he relies upon the Supreme Court's opinion in State v. Bradshaw, 195 N.J. 493 (2008). Defendant argues application of the Bradshaw test demonstrates a less severe sanction was warranted because there was no indication defendant intentionally withheld notice of his alibi for tactical advantage, and his case was severely prejudiced by the inability to present an alibi. We conclude again, his reliance is misplaced.

In Bradshaw, a defendant, who was on trial for sexual assault, notified the prosecution for the first time during trial that he intended to testify that he was elsewhere at the time of the rape. Id. at 498. The trial judge precluded defendant from testifying to any such alibi, finding that the prejudice to the State was great. Id. at 498-99.

In its opinion, the Supreme Court analyzed the "interest of justice" provision in Rule 3:12-2(b)[3] and established a four-factor test for determining

---

[3] Rule 3:12-2, addresses a defendant's obligation to give notice of an alibi defense. It provides as follows:

> (a) Alibi. If a defendant intends to rely in any way on an alibi, within [ten] days after a written demand by the prosecutor the defendant shall furnish a signed alibi, stating the specific place or places at which the defendant claims to have been at the time of the alleged

whether witness preclusion is the appropriate sanction where a defendant has failed to furnish notice of an alibi defense.  Id. at 507-08.  The Court warned "only in the rarest of circumstances" should a defendant be barred from presenting alibi testimony and explained

> in reaching a fair determination for the appropriate sanction for the breach of the alibi rule, the trial court should consider:  (1) the prejudice to the State; (2) the prejudice to the defendant; (3) whether other less severe sanctions are available to preserve the policy of the rule, such as a continuance or a mistrial to permit the State to investigate the alibi; and (4) whether the defendant's failure to give notice was willful and

offense and the names and addresses of the witnesses upon whom the defendant intends to rely to establish such alibi.  Within [ten] days after receipt of such alibi, the prosecutor shall, on written demand, furnish the defendant or defendant's attorney with the names and addresses of the witnesses upon whom the State intends to rely to establish defendant's presence at the scene of the alleged offense.  The trial court may order such amendment or amplification as the interest of justice requires.

(b) Failure to Furnish.  If the information required in paragraph (a) is not furnished, the court may refuse to allow the party in default to present witnesses at trial as to defendant's absence from or presence at the scene of the alleged offense, or make such other order or grant such adjournment, or delay during trial, as the interest of justice requires.

[R. 3:12-2 (emphasis omitted).]

A-3931-18

intended to gain a tactical advantage. Absent a finding that the factors on balance favor preclusion, the interest of justice standard requires a less severe sanction.

[Ibid.]

Applying the above factors, the Court in Bradshaw concluded that the trial judge misapplied his discretion by issuing too severe of a sanction for the defendant's failure to abide by the Court Rules requiring disclosure. Id. at 509. The Court further concluded the preclusion of the alibi testimony was not harmless error. Id. at 509-10.

Here, defendant's case presents different circumstances that distinguish it from Bradshaw. Significantly, it is not clear from the record that the trial judge denied defendant's request to allow Alexander to testify as an alibi witness. The record only confirms the issue was raised, and the judge allowed the parties time to determine whether defendant ever notified the State of his intent to call Alexander for that purpose. The record, therefore, leads us to conclude defendant abandoned this argument, and there was no denial of defendant's request to call an alibi witness to review. See Cranbury Twp. v. Middlesex Cnty. Bd. of Tax'n, 6 N.J. Tax 501, 503 n.1 (Tax 1984) (deeming a contention raised at a pretrial conference but neither briefed nor raised at trial to be abandoned).

A-3931-18

Assuming defendant did not abandon his intention to pursue an alibi defense, applying the Bradshaw factors, we conclude his failure to give notice barred his entitlement to call Alexander as an alibi witness. The first Bradshaw factor requires a reviewing court to weigh the prejudice to the State should a defendant be permitted to assert an unnoticed alibi defense. 195 N.J. at 507. Here, adjourning the matter would have been highly prejudicial as the State could not benefit from the opportunity to investigate defendant's alibi defense. It is extremely likely that any attempt to investigate defendant's presence at the CVS would have been obstructed by the nearly two years that passed since the crimes were committed.

As to the second consideration, several factors militate against a finding that preclusion of Alexander's testimony prejudiced defendant. For example, Alexander provided two statements to the police. The earlier of the two placed defendant at a CVS at the time of the burglary, but the more recent statement, given in connection with Alexander's guilty plea under oath at his plea hearing, incriminated defendant in the burglary. Defendant indicated he wanted to call Alexander to testify to the truthfulness of his first statement—while simultaneously impeaching his credibility as to the second—but defendant knew Alexander expressed he would not testify, and, if he did, defendant had no

guarantee he would provide exonerating testimony consistent with his first statement. If he did recant the latter statement, the State would have cross-examined him, using his sworn testimony from his plea hearing.

As to the third Bradshaw factor, defendant argues a continuance would have been proper and would have ameliorated any disadvantage to the State like in Bradshaw. In Bradshaw, however, the propriety of a continuance was deemed "obvious" because the State specifically requested that remedy, and it would have provided the State an opportunity to investigate the defendant's alibi. Id. at 508-09. In contrast, as noted, further investigation of defendant's suggested alibi would likely have been futile in this matter. Additionally, it is unclear how a continuance would serve to "preserve the policy of the alibi rule"; defendant failed to provide documentation to the State before the first day of trial, and when the trial judge did, in fact, defer a decision on the alibi issue until a later date, the issue was abandoned by the defense.

The final Bradshaw factor requires the reviewing court to consider whether the defendant's failure to provide notice earlier was willful and intended to gain a tactical advantage. Here, defendant's request was made while he was still proceeding pro se. There is no indication in the record that his failure to provide notice sooner was willful or motivated by potential tactical advantage.

A-3931-18

To the contrary, defendant displayed an unfamiliarity with the Court Rules—prompting the trial judge to comment on his lack of training.

Based on these circumstances, we do not discern any error in the trial judge's decision to bar Alexander from testifying as an alibi witness, to the extent he rendered one.

Defendant also argues he was improperly denied the opportunity to present Ucci as a witness to the fact that (1) she saw paint cans under defendant's sink before the burglary, and, following defendant's arrest, the paint cans were no longer under the sink; and (2) Alexander frequented defendant's house and had access to the paint cans. He contends it was error for the trial judge to conclude Ucci's testimony was not relevant because she had no firsthand knowledge of the circumstances surrounding the burglary and had not actually witnessed anyone taking the paint can. Defendant argues this evidence was relevant because it had "a tendency in reason to prove or disprove any fact of consequence" under N.J.R.E. 401.

While we agree with defendant's definition of relevant evidence, see N.J.R.E. 401, we also recognize, in considering whether evidence is relevant, "[t]he inquiry is 'whether the thing sought to be established is more logical with the evidence than without it.'" Buckley, 216 N.J. at 261 (quoting State v.

21

Coruzzi, 189 N.J. Super. 273, 302 (App. Div. 1983)).  We conclude, as the trial judge found, Ucci's proffered testimony was not relevant at all as it had no tendency to prove someone other than defendant used the paint can that was found at the crime scene bearing his fingerprint.

First, Ucci did not see Alexander take the paint can and could not testify he did so.  Moreover, defendant's proffer did not suggest she would or could testify the paint can found in the motel room was the same paint can she had seen at defendant's home.  Second, if admitted, Ucci's testimony would, rather than tend to exonerate him, further incriminate defendant, as it would have established a paint can of the type used in the burglary was once in defendant's possession and was absent from defendant's apartment after his arrest.  Under these circumstances, we conclude the exclusion of Ucci's testimony was not "so wide of the mark" as to constitute an abuse of discretion.

Even if it was error to exclude Ucci's testimony, in light of the overwhelming evidence against defendant, the error was harmless beyond a reasonable doubt when "quantitatively assessed in the context of other evidence presented."  State v. Camacho, 218 N.J. 533, 547 (2014) (quoting Arizona v. Fulminante, 499 U.S. 279, 280 (1991)); cf. State v. J.R., 227 N.J. 393, 417

22

(2017) (citation omitted) ("An evidentiary error will not be found 'harmless' if there is a reasonable doubt as to whether the error contributed to the verdict.").

Here, the evidence of defendant's guilt was overwhelming. The jury heard one of the victims' testimony that someone identifying themselves as defendant called to tell him to pay a debt to Alexander, as well as Peccoreno's testimony about defendant's actions during the burglary, including defendant spray painting "pay your drug debts" on the motel room wall, and defendant owning the knife left at the scene. In addition, Peccoreno confirmed he was picked up by Dowling, Alexander, and defendant in a white Mercedes Benz prior to the burglary. Pasieka testified defendant was in the white Mercedes Benz he pulled over a few blocks away from the scene of the burglary shortly after the crime occurred. Additionally, the jury viewed surveillance footage that showed defendant leaving his nearby apartment shortly prior to the crime in the company of a man and a woman, and other footage showed three male subjects exiting a white vehicle resembling a Mercedez Benz, walking toward the motel, and returning with items the subjects put into the white vehicle. To the extent the trial judge committed any error by barring Ucci's testimony, the totality of the other evidence of defendant's guilt prevents us from concluding that the ruling led to an injustice.

## III.

Next, we address defendant's second point about the trial judge committing plain error in failing to charge the jury with the lesser-included offense of fourth-degree criminal trespass, N.J.S.A. 2C:18-3(a), and about a witness's prior contradictory statements.  As defendant did not object to the absence of these charges at trial, we review these contentions for plain error.  R. 1:7-2; R. 2:10-2 (providing that reviewing courts "shall" disregard any error or omission "unless it is of such a nature as to have been clearly capable of producing an unjust result"); State v. Dunbrack, 245 N.J. 531, 544 (2021).  We conclude there was no error.

## A.

According to defendant, the "record clearly indicated that the jury" could have convicted defendant of criminal trespass instead of burglary.  He correctly states a conviction for burglary requires the State to prove that defendant (1) entered a structure, (2) without permission, and (3) with the purpose to commit an offense therein, N.J.S.A. 2C:18-2; while a conviction for criminal trespass requires the State to prove only the first two elements, N.J.S.A. 2C:18-3(a). State v. Singleton, 290 N.J. Super. 336, 341 (App. Div. 1996).  He argues there was no direct evidence or testimony related to defendant's intent, and the notion

24

that defendant entered the motel room with the intent to commit an offense was refuted by the fact that Peccoreno testified defendant told him to help Alexander move his belongings out of the motel room. He also notes Alexander himself pleaded guilty to criminal trespass.

We conclude the trial judge correctly did not on his own motion include a charge about criminal trespass in his final instructions to the jury because there was no clear evidence that the jury could have convicted defendant of the lesser charge while acquitting him of burglary.

Generally, "courts are required to instruct the jury on lesser-included offenses <u>only</u> if counsel requests such a charge and there is a rational basis in the record for doing so or, in the absence of a request, if the record clearly indicates a charge is warranted." <u>State v. Denofa</u>, 187 N.J. 24, 42 (2006). A charge is warranted when a "jury could convict on the lesser while acquitting on the greater offense." <u>State v. Jenkins</u>, 178 N.J. 347, 361 (2004).

"[W]hen the defendant fails to ask for a charge on lesser-included offenses, the court is not obliged to sift meticulously through the record in search of any combination of facts supporting a lesser-included charge." <u>Denofa</u>, 187 N.J. at 42. The court is obligated to give a lesser-included offense instruction sua sponte only "if the record clearly indicates a lesser-included charge—that

A-3931-18

is, if the evidence is jumping off the page." Ibid. "[S]heer speculation does not constitute a rational basis. The evidence must present adequate reason for the jury to acquit the defendant on the greater charge and to convict on the lesser." State v. Brent, 137 N.J. 107, 118-19 (1994) (citations omitted).

Here, we conclude the record does not clearly indicate a rational basis to acquit defendant of the burglary charge, rather it clearly established he intended to enter the subject motel room to commit the theft. The evidence presented at trial demonstrated that defendant's fingerprints were found on the can of red spray paint found at the scene and that the pocketknife found in the child's crib belonged to defendant. In addition, the jury heard testimony from Smith that an individual identifying himself as defendant called Smith to inform him that he owed defendant's son money and that, when Smith returned home after work, he found the words "pay your drug debts" spray painted on the wall of the motel room and his property was gone. In addition, surveillance footage played by the State depicted three figures exiting a white vehicle parked near the motel before entering and exiting a room at the approximate location of the victim's room on the same evening of the burglary and theft. The footage then shows these figures walking back toward the white vehicle and putting bags in the car, which drives

26

away from the scene only minutes before a white Mercedes Benz containing defendant, Alexander, and Peccoreno is stopped by Pasieka a few blocks away.

While circumstantial, the above facts were sufficient to place defendant at the scene of the crime at the time of the offense and for the jury to have inferred defendant's intent to commit a theft therein. Furthermore, the only evidence before the jury potentially detracting from the inference that defendant intended to commit the charged offenses in the motel room was Peccoreno's testimony that defendant enlisted his help by asking if he could help Alexander move his belongings out of his apartment. That evidence was simply insufficient to have required the trial judge to have charged the lesser included offense, especially considering defendant's failure to request the charge.

## B.

Defendant also argues the trial judge failed to instruct the jury about its consideration of a prior contradictory statements of witnesses, and that failure was compounded by the omission of a "false in one, false in all" charge. We disagree.

27

i.

Defendant's arguments on this point revolve around the testimony provided by Peccoreno. The State called Peccoreno, who testified as a condition of a plea agreement he had made with the State.

Peccoreno testified that as of December 1, 2016, he had known defendant, who was "like a father to [him]" for "three to four years," and that he met Alexander and his girlfriend through defendant on December 1, 2016. Recounting the events of December 1, 2016, Peccoreno testified he agreed to help defendant move Alexander's things out of the motel room and went with them on December 1, 2016, for that purpose, travelling in a white Mercedes Benz driven by Dowling. At the motel, Dowling remained in the car and he, defendant, and Alexander went inside, using Alexander's key. Upon entering the room, they began putting electronic items that Alexander said belonged to him inside bags to be moved to Dowling's residence in Kearny. He also stated he carried a TV out of the motel room.

Peccoreno also testified defendant and Alexander "started spray painting the wall and [he] basically ran out of there because . . . [he] didn't want to get involved with that" and he "didn't know what that was about." Peccoreno stated he observed defendant spray painting "something like pay your debts and

28

something with the Bloods in red." He also stated defendant "left the glove on the floor" and that he thought defendant "also caused some damage with a knife." When the State asked Peccoreno whether he had ever seen defendant in possession of a knife, Peccoreno testified that he had seen defendant in possession of "[a] green knife with an A on it" "at [defendant's] home." After they packed the items into the car, and left the motel, Pasieka stopped the car and spoke with Dowling before the four of them eventually returned to Peccoreno's residence.

On cross-examination, Peccoreno acknowledged on January 21, 2017, he went to the SHPD and provided a false statement, telling them that defendant had nothing to do with the robbery and that, instead, an individual named Daniel Brown assisted in committing the burglary. He testified he gave the false statement at defendant's request because defendant told Peccoreno he was dying, and Peccoreno "didn't want [defendant] to die in jail." When defendant's counsel pressed Peccoreno as to the falsity of his January 21 statement to police and asked Peccoreno to confirm he made the statement in exchange for "looking for [some other charges] to go away," Peccoreno told defendant's counsel that he did not "remember . . . what [defense counsel was] talking about." He also told defense counsel that a video of his statement would "probably" reflect that he

was seeking charges to be dropped in exchange for testimony but that he did not "remember the whole conversation" because he "was on heroin," that defendant gave him, when he gave the statement.

Following the parties' closing arguments, the trial judge provided the full model instruction regarding determining credibility, see Model Jury Charges (Criminal), "Parts 1 and 2 (General Information to Credibility of Witnesses)" (rev. May 12, 2014), including that the jurors were to consider "whether [a] witness made any inconsistent or contradictory statement[s]." The judge did not, however, instruct the jury that it may consider the inconsistent statements not only for credibility, but also "as substantive evidence, that is, proof of the truth of what is stated in the prior contradictory statement," Model Jury Instructions (Criminal), "Prior Contradictory Statements of Witnesses (Not Defendant)" (May 23, 1994)—nor was such an instruction requested.

ii.

At the outset, we observe the jury was never presented with the exact language of Peccoreno's prior statement to police. On cross-examination, Peccoreno admitted to giving a statement to police on January 21, but, although he could not recall exactly what he said, he testified the contents of his statement were "all lies." While defense counsel spent considerable time on cross-

examination referencing the past inconsistent statement to attack Peccoreno's credibility—and thereafter repeated the attack on Peccoreno's credibility at length in summation—defense counsel never showed Peccoreno the prior statement to refresh his recollection, nor was it ever read to the jury.

When a defendant requests the charge and a witness's prior inconsistent statement conveys "conflicting versions of the same event," it is appropriate for a trial judge to charge the jury using the model instruction on the substantive use of prior inconsistent statements. State v. Hammond, 338 N.J. Super. 330, 342-43 (App. Div. 2001). However, the omission of the charge will "not prejudice[ a] defendant's rights" if the defendant used the prior statement to impeach the witness. State v. Provet, 133 N.J. Super. 432, 438-39 (App. Div. 1975). This is so because in a criminal case, where a defendant has no burden of proof requiring substantive evidence, the use of a prior inconsistent statement to impeach "serve[s] the same purpose of disproving [the witness's positive] assertion" as admitting the statement as substantive evidence to prove the negative assertion, and "tends to the same conclusion" by the jury. Id. at 438.

Here, had the prior contradictory statements instruction been given at trial, the instruction would have informed the jury that they could consider Peccoreno's January 21 statement—indicating defendant was not present for or

31

involved with the incidents in the motel room—as substantive evidence. This would have had the same effect as defense counsel using Peccoreno's prior statement to attack his credibility—i.e., discouraging the jury from believing Peccoreno's trial testimony implicating defendant in favor of believing that defendant was not involved. Accordingly, because defendant's use of the content of the statement to impeach Peccoreno's credibility tended toward the same purpose that would have been served by admitting the statement as substantive evidence, the omission of a prior inconsistent statement instruction "could not have prejudiced defendant's rights," and the omission was not "plain error justifying a reversal." Id. at 438-39.

We reach a similar conclusion as to the trial judge not charging Model Jury Charge (Criminal), "False in One-False in All" (rev. Jan. 14, 2013), again primarily because defendant did not request the charge. See R. 2:10-2; State v. McGuire, 419 N.J. Super. 88, 106-07 (App. Div. 2011). The provision of a "false about one fact false about all" instruction is a decision left to the discretion of the trial judge, and the charge may be given where "a witness intentionally testifies falsely as to some material fact." State v. Fleckenstein, 60 N.J. Super. 399, 408 (App. Div. 1960); see State v. Ernst, 32 N.J. 567, 583-84 (1960).

32

Here, there was no error in not giving the charge because defendant did not request it and the trial judge instructed the jury to take into consideration, among a host of other factors, whether any witnesses had testified "with an intent to deceive" them. The judge further instructed the jury that, because of that consideration, the jury must determine the appropriate weight to give the witness's testimony, including whether to "accept all of it, a portion of it, or none of it." As a result, despite defendant's failure to request the charge, the jury was adequately notified it was their job to decide the credibility of all witnesses and determine whether a witness was willfully or knowingly testifying falsely to any of the facts testified to at trial.

IV.

Next, we consider defendant's third point in which he argues the trial judge committed plain error when he allowed Bloomquist to provide lay witness opinion testimony when he narrated portions of the State's videotaped surveillance footage. He contends Bloomquist's testimony was "inadmissible lay opinion testimony because Bloomquist was not an eyewitness to the events shown on the video, so he lacked personal knowledge, and his opinion as to the contents of the videos was not helpful to the jury, as the jury was fully able to evaluate the video itself." Additionally, he argues the testimony's admission

33

was "particularly harmful" because, as the lead detective investigating defendant's case, his testimony that the videos depicted defendant and a Mercedes Benz, and his dismissal of pedestrians he identified in the footage from being involved in this case, "could have easily influenced the jury's evaluation of those videos." Accordingly, defendant argues allowing the testimony was plain error. We disagree.

## A.

The State presented surveillance footage from outside defendant's home, and three locations near the subject motel. While the jury viewed the tapes, Bloomquist narrated the events depicted and provided his interpretation of what was being shown on the tapes.

In the first video that Bloomquist identified as footage of outside of defendant's residence, he stated the video depicted three individuals "walk[ing] upstairs to the second floor. Two males and a female. The person in the middle who I believed to be the defendant . . . is attempting to open the door to his apartment." He later described how the three individuals are depicted leaving the apartment at approximately 7:13 p.m. That was the detective's only specific identification of defendant appearing in a video tape.

34

The next videos played were from locations near the subject motel, and, according to Bloomquist, depicted "a white four-door which appears to be a Mercedes Benz" pulling up. As other vehicles and people other than the occupants of the white four-door entered the view of the camera, Bloomquist stated those vehicles and people had "nothing to do with the case."

Bloomquist then narrated as three subjects got out of the car, walked to the motel, up its stairs, and entered a room. He continued as the subjects left the room and walked "back towards the white Mercedes," two of which appeared to have bags which they placed inside the trunk. Bloomquist continued to narrate as the individuals entered the white vehicle and drove away.

After concluding the presentation of the video evidence, Bloomquist testified that, during his investigation, he was also made aware of a white vehicle stopped nearby by Pasieka, shortly after the white vehicle on camera left the premises near the motel.

During cross-examination about his representations regarding the surveillance footage, Bloomquist admitted that he could not identify any of the individuals entering the apartment in the footage outside defendant's home and that he could not identify any of the individuals leaving the apartment because their faces were not visible, although he indicated he assumed defendant was the

individual that had locked the door to the apartment that they left before heading to the motel. On redirect, Bloomquist testified that he was familiar with defendant's mannerisms and gait, having seen him in person approximately twenty times prior to viewing the surveillance footage, and that he had considered these factors in identifying defendant as the individual locking the door.

Regarding the individuals Bloomquist identified as not involved in the case, during cross-examination, Bloomquist indicated that he could not identify the individuals and did not know where they came from or where they were going. Bloomquist stated that he believed the white, four-door sedan depicted in the video was Dowling's Mercedes Benz, and that he knew it was a Mercedes Benz based on "pulling over vehicles in the past," but he acknowledged that he could not "see any identifying marks" on the car in the video. Bloomquist again identified the white, four-door car in another video clip that he believed to be Dowling's Mercedes Benz, but acknowledged that no distinguishing marks were visible in the video. He also acknowledged due to the video quality there was no way of distinguishing the identity or clothing of the three figures seen walking toward the motel from the direction of the white car, whether they were carrying anything, whether the room they entered was the victims' room, or the

identities of the three figures who walked back to the car from the motel later in the video.

## B.

We again apply the plain error standard to defendant's challenges to Bloomquist's comments that were made during the videotapes' presentation, which he raises for the first time on appeal. With that standard in mind, we begin with defendant's contention that Bloomquist's narration constituted inadmissible lay opinion testimony. We disagree.

It is well established that a police officer may provide testimony describing "what the officer did and saw," because "[t]estimony of that type includes no opinion, lay or expert, and does not convey information about what the officer 'believed,' 'thought' or 'suspected,' but instead is an ordinary fact-based recitation by a witness with first-hand knowledge." State v Singh, 245 N.J. 1, 15 (2021) (quoting State v. McLean, 205 N.J. 438, 460 (2011)). When the officer's testimony transitions into non-expert, lay opinion testimony, the parameters of his or her testimony are different.

"Lay opinion is admissible 'if it falls within the narrow bounds of testimony that is based on the perception of the witness and that will assist the jury in performing its function.'" State v. Sanchez, 247 N.J. 450, 466 (2021)

(quoting Singh, 245 N.J. at 14).  Opinion testimony of a lay witness is governed by N.J.R.E. 701, which states, "[i]f a witness is not testifying as an expert, the witness'[s] testimony in the form of opinions or inferences may be admitted if it:  (a) is rationally based on the witness'[s] perception; and (b) will assist in understanding the witness'[s] testimony or determining a fact in issue."  The Rule was adopted to "ensure that lay opinion is based on an adequate foundation."  Singh, 245 N.J. at 14 (quoting State v. Bealor, 187 N.J. 574, 586 (2006)).

"The first prong of N.J.R.E. 701 requires the witness's opinion testimony to be based on the witness's 'perception,' which rests on the acquisition of knowledge through use of one's sense of touch, taste, sight, smell or hearing."  Singh, 245 N.J. at 14 (quoting McLean, 205 N.J. at 457).  Therefore, the witness's knowledge may not be acquired through "hearsay statements of others."  Sanchez, 247 N.J. at 469 (citing N.J.R.E. 701).  But, "[t]he witness need not have witnessed the crime or been present when the photograph or video recording was made in order to offer admissible testimony" about what is depicted.  Ibid.

Under the Rule's second prong, the lay witness's testimony must "assist the trier of fact either by helping to explain the witness's testimony or by

shedding light on the determination of a disputed factual issue." Singh, 245 N.J. at 15 (quoting McLean, 205 N.J. at 458).

In Singh, the Court determined

> a police officer's lay opinion met N.J.R.E. 701's first prong . . . . There, an armed robbery was captured on surveillance video and the officer who arrested the defendant was properly permitted to testify that the sneakers worn by the perpetrator in the video were "similar" to the sneakers worn by the defendant when the officer encountered him shortly after the robbery. Although the officer did not witness the crime, he had personal knowledge of the sneakers worn by the defendant in its immediate aftermath, and his testimony thus satisfied N.J.R.E. 701's first prong.
>
> [Sanchez, 247 N.J. at 468 (citations omitted).]

In Sanchez, the Court affirmed our reversal of a trial judge's decision to bar a parole officer's testimony about telling "a detective investigating a homicide and robbery that [the] defendant was the individual depicted in a photograph derived from surveillance video taken shortly after the crimes." Id. at 458. The Court concluded that, since the parole officer "became familiar with defendant's appearance by meeting with him on more than thirty occasions during his period of parole supervision," "[h]er identification of defendant as the front-seat passenger in the surveillance photograph was 'rationally based on [her] perception,' as N.J.R.E. 701 requires." Id. at 469.

Applying these principles to the instant case, and contrary to defendant's assertions, the fact that Bloomquist did not personally witness the events depicted in the surveillance footage does not mean his narration of the footage was inadmissible pursuant to N.J.R.E. 701. The detective did not purport to provide an eyewitness account, and his testimony was relevant to aid the jury in its understanding of what was depicted, with which he was familiar from his investigation of the areas depicted. Additionally, due to the poor quality in some of the footage, the narration from an individual with personal knowledge of the locations was undoubtedly helpful to the jury.

Although on appeal defendant also argues it was error for the trial judge to permit Bloomquist's identification of defendant in the video footage taken from outside defendant's home, he never raised this argument to the trial judge. To the contrary, regarding the footage taken from outside defendant's home, defense counsel stated in summation, "we're not arguing that's not the defendant. That's his apartment and he's there with a woman." (Emphasis added).

In any event, Bloomquist testified in this regard that he only "believed" the person in that first video to be the defendant. On cross-examination, he testified that he could not see defendant's face in the video and assumed it was defendant because he was locking his front door. Further, on redirect,

40

Bloomquist testified that he knew that the apartment in question belonged to defendant, that he had previously encountered defendant on approximately twenty occasions, and that he was familiar with defendant's mannerisms and gait based on these contacts. None of the officer's descriptions referred to defendant committing any offense while being taped. Under these circumstances, we cannot discern any error, let alone plain error, in permitting Bloomquist to testify as to defendant's identity in the one videotape.

Defendant also argues it was plain error to admit Bloomquist's testimony throughout his narration referring to the white vehicle in the footage as a Mercedes Benz because Bloomquist's testimony was "not based on what is observable in the videos." To that point, defendant notes that Bloomquist admitted on cross-examination that there were no identifying markings on the white vehicle in the footage, and his conclusion that the white, four door sedan was a Mercedes Benz was based on his experience "pulling over vehicles in the past." On redirect, Bloomquist also testified that the vehicle depicted in the videos matched the description of the vehicle stopped by Pasieka "seven minutes after" the white vehicle left the scene in the footage from near the subject motel.

Defendant's contentions about the identification of the vehicle are without merit. Bloomquist's opinion was based upon his perception and past

41

experiences, did not require detailed measurements or scientific analysis, and assisted in determining a fact in issue. There was no error in allowing Bloomquist's hedged opinion testimony as to the make of vehicle depicted in the footage. Even if it was error under the circumstances, it was not plain error "clearly capable of producing an unjust result." R. 2:10-2.

Defendant further argues it was plain error for the court to admit Bloomquist's testimony dismissing certain individuals depicted in the surveillance footage as irrelevant. At several points during his narration, Bloomquist referred to individuals depicted in the footage and stated that the individuals were not relevant to the crime, yet, on cross-examination, he admitted he did not know who those people were or what they were doing. Defendant argues this was misleading to the jury because "[i]t was entirely possible that the people that he dismissed as irrelevant were the actual perpetrators of the burglary, but Bloomquist told the jurors that this was not the case." According to defendant, the same was true for Bloomquist's commentary regarding individuals that were not relevant to the investigation. We disagree.

Bloomquist's opinion was based on his perception and knowledge of the area and the camera angles, did not require detailed measurements or scientific analysis, and assisted in determining a fact in issue. Moreover, at no point

during this narration—or at any time other than the footage depicting defendant's home—did Bloomquist identify defendant as one of the individuals in the footage. Ultimately, the question of who the individuals were and what crime they committed was properly left for the jury. Accordingly, based on the foregoing, there was no error in the admission of Bloomquist's narration, let alone error capable of producing an unjust result. R. 2:10-2.

V.

In his fourth point, defendant argues the trial judge committed plain error when it permitted witnesses to testify as to facts that indicated defendant had a propensity for criminal activity. Specifically, defendant argues it was plain error for the trial judge to permit Bloomquist to testify he knew defendant from prior encounters, Pasieka to testify defendant lived in a "notorious problem" area, and a fingerprint examiner to testify law enforcement had defendant's fingerprint on file without issuing a limiting instruction.

As already noted, at trial, during cross-examination, Bloomquist identified defendant as the individual shown leaving defendant's apartment and locking the door behind him, initially only because he was locking the door and not from seeing defendant's face in the videotape. However, on redirect, Bloomquist stated he knew defendant resided at the depicted location, and that

he personally visited the location when he retrieved the video footage.

Additionally, the following exchange occurred with the prosecutor about

Bloomquist's prior contact with defendant:

> [Prosecutor]: And prior to even the December [first] incident, you had prior contact with the defendant; correct?
>
> [Bloomquist]: Correct.
>
> [Prosecutor]: And those contacts were of the nature of in-person contacts; right?
>
> [Bloomquist]: Correct.
>
> [Prosecutor]: You had seen him physically before; correct?
>
> [Bloomquist]: Yes.
>
> [Prosecutor]: Can you estimate on how many occasions you've seen him before the image that we see on[the videotape]? Roughly.
>
> [Bloomquist]: I'd say [twenty].
>
> [Prosecutor]: And based upon those previous contacts, have you become familiar with his physical characteristics?
>
> [Bloomquist]: Yes.
>
> [Prosecutor]: Have you become familiar with his gait?
>
> [Bloomquist]: Yes.

A-3931-18

[Prosecutor]: And his mannerisms?

[Bloomquist]: Yes.

[Prosecutor]: And were all those things you considered when you testified with respect to the person we see on [the videotape] as being the defendant?

[Bloomquist]: Yes.

Contrary to defendant's contention before us, Bloomquist's testimony that was elicited in response to defense counsel's questions about identifying defendant, did not lead to any prejudice to defendant by implying he had committed previous criminal acts. See State v. Love, 245 N.J. Super. 195, 197-98 (App. Div. 1991) (concluding officer's testimony on cross-examination about "prior contact" with the defendant, in which the officer interviewed him during a homicide investigation, did not provide the jury with an inference that the defendant "had been involved in prior criminal activity"). Significantly, Bloomquist did not testify his prior contacts with defendant sprang from defendant's involvement in any criminal investigation. Here, not only was there no inference that defendant had committed other crimes, but there was also no risk that Bloomquist's testimony could have provided improper weight to the victims' or any other witness's identification of defendant in the video, as no

other witness provided such an identification. Under these circumstances, there was no error in allowing the challenged testimony.

We reach a similar result as to defendant's challenge for the first time on appeal as to Pasieka's testimony regarding his reasons for pulling over the white Mercedes Benz. Pasieka testified he had seen the car—which he did not recognize—in an area that had "been a notorious problem . . . so [he] just wanted to check it out." According to defendant, this testimony was irrelevant to any discrete issue and, even if it were relevant, its probative value was substantially outweighed by the risk of prejudice to defendant under N.J.R.E. 403.

Contrary to defendant's contention, we conclude the officer's testimony was relevant, see N.J.R.E. 401, and its probative value was not substantially outweighed by the risk of undue prejudice, N.J.R.E. 403(a). Here, Pasieka's testimony was offered to demonstrate why Pasieka followed the car and eventually pulled it over. To that end, the testimony was certainly relevant to explain why the vehicle that defendant was traveling in was stopped near the motel. The testimony was not offered for the purpose of buffering the State's case by creating an inference that defendant must be involved in criminal activity because the area he was in was known for such. Furthermore, aside from indicating that Dowling had failed to stop at a stop sign, Pasieka's

46

testimony that he recognized the occupants in the vehicle and released them without even a citation indicated to the jury that defendant was not engaged in criminal activity. Accordingly, Pasieka's testimony was relevant, and carried minimal risk of prejudicing defendant, if at all. Here, again the admission of this testimony was not an error.

In defendant's final argument under his fourth point, he argues it was plain error for the trial judge to allow a fingerprint expert's testimony that defendant's fingerprint was on file with the police department without administering the model limiting instruction for fingerprint evidence[4] as it "indicated to jurors that

---

[4] The model limiting instruction for fingerprint evidence provides:

> There was testimony that the (law enforcement agency) had fingerprints of the defendant on file. You are not to consider that fact as prejudicing the defendant in any way.
> That fact is not evidence that the defendant has ever been convicted, or even arrested for any crime, and is not to be considered as such by you. The fact that the (law enforcement agency) is in possession of a person's fingerprints does not mean that the person has a criminal record. Fingerprints come into the hands of law enforcement agencies from many legitimate sources. These include, but are not limited to: birth certificates, grade school child identification programs, military service, many forms of employment, including municipal, county, state and federal jobs, casino license applications, private security guard applications,

A-3931-18

[defendant] had a criminal history."  Despite the fact that no such limiting instruction was requested, defendant argues that the judge should have issued the instruction sua sponte.

At trial, a fingerprint examiner testified a fingerprint obtained from the spray paint can found in the victims' motel room matched an exemplar of defendant's fingerprints, and explained an exemplar is a copy of fingerprints kept for records, examinations, and for comparison to latent prints that were obtained.  Prior to the expert's testimony, the trial judge discussed with counsel the best manner of redacting the fingerprint exemplar that was taken in connection with a separate matter, with defense counsel's requested redactions ultimately being made to the exemplar.  The expert testified fingerprint exemplars are "taken under a controlled environment," but neither the expert nor any other witness testified as to why defendant's fingerprint was on file with the police, and no limiting jury instruction was requested or provided.

---

firearms and liquor license applications, passport applications, as well as other sources totally unconnected with criminal activity.

[Model Jury Charges (Criminal), "Fingerprints" (rev. Jan. 6, 1992).]

Here again, because no limiting instruction was requested at trial, we review the trial judge's alleged failure to give such an instruction for plain error. See State v. Cole, 229 N.J. 430, 455 (2017). Although defendant speculates the mere mention of a fingerprint may imply the defendant's involvement in prior criminal activity, there was no mention of any such involvement in the fingerprint expert's testimony, and the fingerprint exemplar that had been shown to the jury was redacted based upon defense counsel's specific recommendations. As noted in the model jury instruction, fingerprints may reach law enforcement from many different sources "totally unconnected with criminal activity." Model Jury Charges (Criminal), "Fingerprints" (rev. Jan. 6, 1992). Based on the foregoing, the risk that the jury might infer defendant's prior criminal activity based solely upon the fact that the police department had access to his fingerprint was small.

In any event, it is likely that defense counsel's declination to request such an instruction was a tactical decision. As the Court has noted, the decision to seek a limiting instruction is not without certain tactical considerations; such instructions "may provide important guidance as the jury evaluates" the evidence, but may also "focus the jury's attention" on evidence that "it might otherwise have ignored." Cole, 229 N.J. at 455-56. Here, defense counsel was

49

aware of the potential for impermissible prior crimes evidence and requested certain redactions to the exemplar accordingly. Moreover, the jury was not provided with any evidence that defendant's fingerprint was on record in connection with a prior criminal investigation, and they did not ask any questions regarding the circumstances surrounding the fingerprint being on file. Any limiting instruction on the matter would have called the jury's attention to this issue, where it may have otherwise carried little weight.

We are not persuaded by defendant's reliance on State v. Swint, 364 N.J. Super. 236 (App. Div. 2003). In Swint, the trial judge failed to provide a limiting instruction following the State's use of the defendant's photograph in a photo array. There, the State characterized the photographs in the array as "mug shots," and, unlike here, the defense in Swint requested a limiting instruction but the trial judge refused. Id. at 240-41. We concluded the trial judge's refusal to provide the model instruction on the use of photographs as requested by the defendant could not be considered harmless error because the jury asked multiple questions regarding the circumstances surrounding the selection of photographs for the photo array. Id. at 241-43. We observed the jury became "obviously concerned about the 'criteria' used to select the photos shown to the victims. The legal concern [was] that police photos suggest . . . defendant had

a criminal history, may have been suspect for that reason, and the jury may then find him guilty on the same basis." Id. at 243. Here, there was no concern or question expressed by the jury and defendant never requested any particular charge to the jury addressing the challenged testimony. Here therefore the trial judge did not commit plain error in not providing limiting instructions to the jury sua sponte.

## VI.

Last, we address defendant's challenge to his sentence based upon his contention that the trial judge did not properly weigh the aggravating and mitigating factors. Specifically, relying on State v. Nataluk, 316 N.J. Super. 336, 349 (App. Div. 1998), defendant argues the judge failed to properly consider the evidence of defendant's failing mental health in favor of mitigating factor four ("substantial grounds tending to excuse or justify the defendant's conduct, though failing to establish a defense"). N.J.S.A. 2C:44-1(b)(4). He contends the judge should have applied that factor because defendant's "Attention Deficit Hyperactivity Disorder, Severe Depression, Bipolar Disorder, and Anti-Social Personality Disorder" contributed to his behavior. However, defendant concedes the judge mentioned defendant's mental health issues but found they "didn't rise to the level of being a statutory defense to the crimes."

We review sentencing determinations under a deferential standard, <u>State v. Grate</u>, 220 N.J. 317, 337 (2015) (quoting <u>State v. Lawless</u>, 214 N.J. 594, 606 (2013)), and are bound to uphold the trial judge's sentence unless "(1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found . . . were not based upon competent and credible evidence in the record; or (3) 'the application of the guidelines to the facts . . . makes the sentence clearly unreasonable so as to shock the judicial conscience.'" <u>State v. Fuentes</u>, 217 N.J. 57, 70 (2014) (quoting <u>State v. Roth</u>, 95 N.J. 334, 364-65 (1984)).

We begin by concluding defendant's reliance on <u>Nataluk</u>, is inapposite. In that case, the defendant presented an insanity defense based on his bipolar disorder, amnesia, and severe hallucinations. <u>Nataluk</u>, 316 N.J. Super. at 342. The trial judge in that case was presented with expert testimony that the defendant had suffered several traumatic brain injuries and had a history of drug and alcohol abuse and, as a result, he suffered from conditions that rendered him unaware of his conduct on the night of the shooting. <u>Id.</u> at 342-43. In addition, the defense called numerous witnesses who corroborated defendant's history of injury and resultant abnormal behavior. <u>Id.</u> at 341-42. Although the jury ultimately rejected the defendant's insanity defense, on appeal we concluded there was significant support for a finding of mitigating factor four. <u>Id.</u> at 349.

Here, defendant did not request a finding under mitigating factor four, nor did he produce any medical or psychological reports at trial to indicate a history of mental conditions that should have been considered under mitigating factor four. There was no evidence at all for the trial judge to have relied upon in applying that mitigating factor, especially in light of the failure of defendant to even request consideration of that factor. The judge did not abuse his discretion in sentencing defendant, leaving us with no cause to disturb the outcome here.

## VII.

Because we conclude the trial judge did not commit any errors, we need not address defendant's remaining argument that he was denied a fair trial due to the trial judge's cumulative errors.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3931-18